No. 25-3700

---

### In the
### United States Court of Appeals
### For the Sixth Circuit

_____

**JANOS ROPER**
*Plaintiff-Appellant*

**v.**

**CITY OF CINCINNATI FIRE DEPARTMENT**
*Defendant-Appellee*

**On Appeal from the United States District Court
For the Southern District of Ohio, Western Division, Case No. 1:22CV652**

---

**CORRECTED BRIEF OF DEFENDANT-APPELLEE
CITY OF CINCINNATI**

---

Respectfully submitted,

**EMILY SMART WOERNER (0089349)
CITY SOLICITOR**

Katherine C. Baron (0092447)
Assistant City Solicitor
801 Plum Street, Room 214
Cincinnati, Ohio 45202
Phone: (513) 352-4705
Katherine.Baron@cincinnati-oh.gov
*Counsel for Appellee- Defendant*

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTERESTS

Pursuant to 6th Cir. R. 26.1, Defendant-Appellee makes the following disclosures:

1.  Is said party a subsidiary or affiliate of a publicly-owned corporation?

    No.

    If the answer is YES, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

2.  Is there a publicly-owned corporation, not a party to the appeal, that has a financial interest in the outcome?

    No.

    If the answer is YES, list below the identity of such corporation and the nature of the financial interest:

*/s/ Katherine C. Baron*                                                    April 14, 2026___
(Signature of Counsel)                                                        (Date)

ii

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................iv

**STATEMENT CONCERNING ORAL ARGUMENT** ......................................1

**JURISDICTIONAL STATEMENT**................................................................1

**STATEMENT OF ISSUES** ........................................................................1

**STATEMENT OF CASE** ..........................................................................1

    A. Statement of the Facts ................................................................1
    B. Procedural Posture..................................................................3

**SUMMARY OF ARGUMENT**...................................................................4

**STATEMENT OF THE STANDARD OF REVIEW** ...........................................6

**ARGUMENT** ......................................................................................6

    1. The District Court's grant of summary judgment in favor of the City was proper as the record demonstrates that Roper was not similarly situated to the promoted individuals and both protected and nonprotected Individuals experienced technical problems during the exam................................................................................7

        A. As the promoted individuals all scored higher than Roper, the District Court correctly found that Roper did not possess similar qualifications to those promoted. .........................................8
        B. Roper's claim that the City treated similarly situated nonprotected individuals more favorably with the promotional exam is discredited as nonprotected test-takers received the same problematic exam as Roper.................................................................................9

**CONCLUSION**..................................................................................10

**CERTIFICATE OF SERVICE** .................................................................13

# TABLE OF AUTHORITIES

**Cases**

*Ball v. Holland*, 142 Fed App'x 860, (6th Cir. 2005)...................................................6

*Brown v. Tennessee*, 693 F.2d 600, (6th Cir. 1982) ...............................................5, 6

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, (6th Cir. 1998)............7

*Evans v. Toys R Us Ohio, Inc.*, 2000 U.S. App. LEXIS 14076, (6th Cir.) ..............8

*Gaffney v. Potter*, 345 F. App'x 991, (6th Cir. 2009)................................................8

*Johnson v. Metro. Govt. of Nashville & Davidson Cty.*, 502 F. App'x 523, (6th Cir. 2012)........................................................................................................8

*O'Donnell v. City of Cleveland*, 838 F.3d 718, (6th Cir. 2016) ...............................6

*Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, (6th Cir. 1994).......................7

*Troche v. Crabtree*, 814 F.3d 795, (6th Cir. 2016)...................................................6

**Statutes**

R.C. 124.46 ..............................................................................................................3

**Rules**

Fed. R. Civ. P. 56.......................................................................................................6

## STATEMENT CONCERNING ORAL ARGUMENT

Although Defendant-Appellee City of Cincinnati Fire Department (hereinafter the "City") is prepared to participate, oral argument is not necessary in this case. The relevant facts are not in dispute and oral argument will not clarify the legal issues. The legal arguments are adequately presented in the briefs.

## JURISDICITIONAL STATEMENT

The City accepts the jurisdictional statement prepared by Plaintiff-Appellant Janos Roper (hereinafter "Roper").

## STATEMENT OF ISSUES

1. Whether the District Court erred when it determined that Roper failed to establish that the City treated similarly situated nonprotected individuals more favorably during the examination process where (1) Roper scored lower on the exam than the promoted individuals and (2) both protected and nonprotected individuals experienced technical issues during the examination.

## STATEMENT OF THE CASE

### A. Statement of the Facts

For purposes relevant to this appeal, the City provides the following statement of facts:

Roper who identifies as Asian, Caucasian, and African American was hired by the City of Cincinnati Fire Department as a firefighter on January 2, 2000.

1

(Complaint, R. 2, ¶¶ 20, 23; Roper Depo., R. 39, PageID # 649; CHRIS Report, R. 39-1; Interrogatory Responses, R. 39-11, PageID # 880). The City currently employs Roper as a Fire Captain. (CHRIS Report, R. 39-1).

In 2019, Roper applied for and took the District Chief promotional exam. (Compl., R. 2, ¶ 24; Roper Depo., R. 39, PageID # 669). During the promotional exam process, Roper along with five other individuals, Joseph Glisson (Male, Black), Kenneth LeMaster (Male, White), Maurice Byrd (Male, Black), Elton Britton (Male, Black), and Phillip Worsham (Male, Black) experienced technical issues. (Compl., R. 2, ¶ 24; Burks Email, R. 39-4; Burks Depo., R. 41, PageID # 1181; Interrogatory Response, R. 39-11, PageID # 888; MSJ Exhibits 1-4, R. 49-1 through R. 49-4). These issues caused the document's header to shift onto the next page and resulted in formatting problems. (IOS Response, R. 41-5). Upon investigation, Industrial/Organizational Solutions ("IOS"), the exam vendor, determined there was not a software glitch and that the best course of action was to not penalize any candidate for formatting errors during the grading process. (*Id.*; Roper Depo., R. 39, PageID # 678-679).

Once the exam process was completed, IOS created an eligible list, ranking candidates in order of their scores. (Roper Depo., R. 39, PageID # 700, 701; Eligible List, R. 39-7). Nathaniel Cash received the highest exam score and was promoted to District Chief on January 12, 2020. (Roper Depo., R. 39, PageID # 712-713; Eligible

2

List, R. 39-7; MSJ Exhibit 5, R. 49-5). Roper was ranked sixteenth. (Roper Depo., R. 39, PageID # 702; Eligible List, R. 39-7; Interrogatory Responses, R. 39-11, PageID # 888). As there were only eleven vacancies before the eligible list expired and pursuant to R.C. 124.46 the City is required to fill vacancies in rank order, Roper was not promoted to District Chief. (Roper Depo., R. 39, PageID # 702, 703; Burks Depo., R. 41, PageID # 1151; Breitfelder Depo., R. 43, PageID # 1288).

On January 27, 2020, Roper duel filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission ("OCRC") against the City of Cincinnati Fire Department which alleged that during the District Chief exam process, he was subjected to different terms and conditions of employment based solely on his race. (2020 OCRC Charge, R. 39-5). Two years later, Roper duel filed another Charge of Discrimination, but this time he alleged that the City denied him a promotion based on his race/disability and in retaliation for complaints he made. (Compl., R. 2, ¶ 111, Roper Depo., R. 39, PageID # 704-705; Interrogatory Responses, Doc. 39-11, PageID # 888; 2022 OCRC Charge, R. 39-24). Both Charges of Discrimination were dismissed, and Roper was issued Dismissal and Notice of Rights letters. (Roper Depo., R. 39, PageID # 697, 707; 2021 Right to Sue, R. 39-6; 2022 Right to Sue, R. 39-25).

## B. Procedural Posture

3

For purposes relevant to this appeal, the City provides the following procedural posture:

On June 22, 2022, Roper brought this suit against the City in the Hamilton County Court of Common Pleas alleging that he was denied a promotion based on his race/disability and his participation in "protected activity." (Notice of Removal, R. 1; Compl., R. 2). The City removed the case to the United States District Court for the Southern District of Ohio, Western Division on November 10, 2022 and filed a motion to dismiss. (Notice of Removal, R. 1.; Motion to Dismiss, R. 13). The City's motion was granted in part and denied in part, leaving only Roper's race, disability, and retaliation claims for the District Court to decide on summary judgment. (Order on Motion to Dismiss, R. 20).

On October 3, 2024, the City filed a motion for summary judgment arguing that the undisputed facts showed that Roper's claims were severely deficient, unsupported, and often times speculative. (Motion for Summary Judgment, R. 49). The District Court agreed and on July 31, 2025 granted the City's motion in its entirety. (Order on Motion for Summary Judgment, R. 53). On August 29, 2025, Roper timely appealed to the United States Court of Appeals for the Sixth Circuit. (Notice of Appeal, R. 56).

**SUMMARY OF ARGUMENT**

The District Court's decision to grant the City's motion for summary judgment was well supported and should remain undisturbed.

While Roper's complaint alleged that he was not promoted because of his purported disability and/or in retaliation for complaints he made to management, his appeal completely fails to address the District Court's issuance of summary judgment on these claims. (*See* generally, Brief of Plaintiff-Appellant, R. 13). As such, the City will only address the District Court's decision to enter summary judgment in favor of the City on Roper's failure to promote based on race claim.

Roper has failed to identify any legal basis or rationale to support his assertion that the District Court erred when it granted the City's motion for summary judgment on Roper's failure to promote based on race discrimination claim. In order to make a prima facie case of discrimination based upon a failure to promote, the plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for a promotion was denied. *Brown v. Tennessee*, 693 F.2d 600, 603 (6th Cir. 1982). Here, the District Court correctly opined that Roper neglected to meet his burden as to the final element because (1) he scored lower on his exam than the promoted individuals and this did not have similar qualifications and (2) both protected and nonprotected

individuals experienced problems with their exams. (Order on Motion for Summary Judgment, R. 53, PageID # 1667-1670).

In conclusion, Roper has not properly identified any reasons the District Court erred in granting the City's motion for summary judgment and therefore, the City respectfully requests that this Court affirm the District Court's decision.

## STATEMENT OF THE STANDARD OF REVIEW

This Court reviews the District Court's grant of summary judgment *de novo*. *Ball v. Holland*, 142 Fed App'x 860, 862 (6th Cir. 2005). Summary judgment is appropriate pursuant to Fed. R. Civ. P. 56 when after viewing the evidence and drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law. *Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016). However, a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a summary judgment motion. *O'Donnell v. City of Cleveland*, 838 F.3d 718, 724 (6th Cir. 2016).

## ARGUMENT

Roper is in the unenviable position of having to argue that the District Court erred when it found that he failed to support a prima facie claim of failure to promote based on race discrimination where the record demonstrates that Roper was not

similarly situated to the promoted individuals and that both protected and nonprotected individuals experienced technical issues during their exams.

    1. **The District Court's grant of summary judgment in favor of the City was proper as the record demonstrates that Roper was not similarly situated to the promoted individuals and both protected and nonprotected individuals experienced technical problems during the exam.**

The District Court's decision granting the City's summary judgment motion was well supported and proper as the record shows that Roper failed to identify a similarly situated candidate outside the protected class who was treated more favorably than him.

In order to make a prima facie case of discrimination based upon a failure to promote, Roper needed to demonstrate among other things that employees of similar qualifications who were not members of the protected class received promotions at the time his request for a promotion was denied. *Brown* 693 F.3d 600 at 603 (applying the *McDonnell-Douglas v. Green*, 411 U.S. 792 (1973)). To establish that two people are similarly situated, a plaintiff does not need to demonstrate an exact correlation with the employee receiving more favorable treatment. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Instead, a plaintiff is simply "required to prove that all *relevant* aspects of his employment situation were 'nearly identical' to those of the non-minority's employment situation." *Id.* (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). "To be deemed similarly situated, the individuals with whom the plaintiff seeks to

7

compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and have been engaged in the same conduct." *Evans v. Toys R Us Ohio, Inc.*, 2000 U.S. App. LEXIS 14076, *28-29 (6th Cir.) (quoting *Mitchell* at 582-83).

### A. As the promoted individuals all scored higher than Roper, the District Court correctly found that Roper did not possess similar qualifications to those promoted.

In Roper's case the District Court found that because the promoted individuals received higher exam scores than Roper, they did not possess similar qualifications and in turn, were not similarly situated. (Order on Motion for Summary Judgment, Doc. 53, PageID # 1669). This notion is well supported within the Sixth Circuit. *See Gaffney v. Potter*, 345 F. App'x 991, 993 (6th Cir. 2009) (holding that differences in performance ratings render two employees not similarly situated); *see also Johnson v. Metro. Govt. of Nashville & Davidson Cty.*, 502 F. App'x 523, 537 (6th Cir. 2012) ("…a candidate's score is relevant in deciding whether [p]laintiffs were similarly situated to the officers that were selected for promotion. Inclusion on the eligibility roster only qualifies a candidate for promotion but did not guarantee it.").

Here, the record demonstrated that candidates took the promotional exam, their scores were evaluated, and then they were placed on the eligible list in rank order. (Roper Depo., R. 39, PageID # 669-670; Eligible List, R. 39-7). Roper scored 84.62 which ranked him sixteenth on the eligible list. (Roper Depo., R. 39, PageID # 700;

Eligible List, R. 39-7). Notably, the promoted candidates all scored higher than Roper. (Eligible List, R. 39-7). As such, the District Court correctly found that Roper was not similarly situated to the promoted individuals and properly issued summary judgment in the City's favor.

**B. Roper's claim that the City treated similarly situated nonprotected individuals more favorably with the promotional exam is discredited as nonprotected test-takers received the same problematic exam as Roper.**

Attempting to circumvent the District Court's finding that candidates' scores are relevant when determining whether individuals are similarly situated, Roper argues that the District Court's analysis was improper because it "failed adequately to take into account that the exam process itself was flawed."   (Order on Motion for Summary Judgment, R. 53, PageID # 1669; Appellant Brief, R. 13, Page 19). However, this is perplexing because the District Court did consider Roper's assertion that the exam was flawed and found that even when accounting for the exam issues, Roper's failure to promote claim still fell flat. (Order on Motion for Summary Judgment, R. 53, PageID # 1670).

Six candidates experienced technical issues during the examination. (Burks Email, R. 39-4). They were Joseph Glisson (Male, Black), Kenneth LeMaster (Male, White), Maurice Byrd (Male, Black), Janos Roper (Male, Black), Elton Britton (Male, Black), and Phillip Worsham (Male, Black). (*Id.*; Motion for Summary Judgment Exhibit 1-4). As a result of the issues, IOS "…determined the best course

9

of action would be to not penalize any candidates for formatting errors during the grading process. Assessors were explicitly instructed to ignore any formatting concerns within the document. IOS also ensured each item corresponded to the correct topic for the 11 items on the exam." (IOS Response, R. 41-5). The District Court found that this demonstrated the City treated all examinees equally. (Order on Motion for Summary Judgment, R. 53, PageID # 1669). Moreover, the District Court highlighted that both protected and nonprotected individuals alike experienced the same technical issues with the exam, thus discrediting Roper's claim that the City treated nonprotected individuals more favorably. (*Id.*, PageID # 1670). Based on this, the District Court soundly found that because Roper did not ascertain that Caucasian test takers were treated more favorably than himself, he failed to support a prima facie claim of failure to promote based on race discrimination and granted the City's summary judgment motion.

## CONCLUSION

In conclusion, the District Court did not err in granting the City's motion for summary judgment. As explained, Roper inarguably failed to demonstrate that similarly situated nonprotected individuals were treated more favorably than him when taking the District Chief promotional exam–a necessary element for a failure to promote based on race discrimination claim. Accordingly, the City respectfully requests that this Court affirm the District Court's decision.

Respectfully submitted,

**EMILY SMART WOERNER (0089349)**

*/s/ Katherine C. Baron*
Katherine C. Baron (0092447)
Assistant City Solicitor
801 Plum Street, Room 214
Cincinnati, Ohio 45202
Phone: (513) 352-4705
Katherine.Baron@cincinnati-oh.gov
*Counsel for Appellee- Defendant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief of Defendant-Appellee is in compliance with Fed. R. App. P. 32(a). This brief contains 2,272 words, excluding those words exempted under Fed. R. App. P. 32(f), and was prepared with Microsoft Office 365, using Times New Roman font at 14-point.

*/s/ Katherine C. Baron*
Katherine C. Baron (0092447)

11

# ADDENDUM

Appellee's designation of the District Court Record from 25-cv-370

| Document Description | Docket Entry No. | Page ID |
| --- | --- | --- |
| Notice of Removal | R. 1 | 1-3 |
| Complaint | R. 2 | 5-19 |
| Motion to Dismiss | R. 13 | 112-130 |
| Order on Motion to Dismiss | R. 20 | 521-534 |
| Roper Deposition | R. 39 | 678-679, 649, 669, 697, 699-700, 701, 702, 703, 704-705, 707, 712-713 |
| CHRIS Report | R. 39-1 | 826-827 |
| Burks Email | R. 39-4 | 848 |
| 2020 OCRC Charge | 39-5 | 849 |
| 2021 Right to Sue | R. 39-6 | 850 |
| Eligible List | R. 39-7 | 851 |
| Interrogatory Responses | R. 39-11 | 880, 888 |
| 2022 OCRC Charge | R. 39-24 | 1117-1119 |
| 2022 Right to Sue | R. 39-25 | 1120-1124 |
| Burks Deposition | R. 41 | 1151, 1181 |
| IOS Response | R. 41-5 | 1243 |
| Breitfelder Deposition | R. 43 | 1288 |
| Motion for Summary Judgment | R. 49 | 1457-1474 |
| MSJ Exhibits 1-4 | R. 49-1 through R. 49-4 | 1475-1483 |
| MSJ Exhibit 5 | R. 49-5 | 1484 |
| Order on Motion for Summary Judgment | R. 53 | 1662-1677 |
| Notice of Appeal | R. 56 | 1684 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing has been filed and served electronically through the Court's ECF System on all parties this 14th day of April 2026.

*/s/ Katherine C. Baron*
Katherine C. Baron (0092447)

4925-3372-9436, v. 3

13



**User Name:** Katherine Baron
**Date and Time:** Tuesday, April 14, 2026 3:22 PM EDT
**Job Number:** 281491670

## Documents (4)

1. *Johnson v. Metro. Gov't of Nashville & Davidson County*
   **Client/Matter:** -None-
2. *Gaffney v. Potter*
   **Client/Matter:** -None-
3. *Evans v. Toys R Us Ohio, Inc.*
   **Client/Matter:** -None-
4. *Ball v. Holland*
   **Client/Matter:** -None-

⚠️ Last updated  April 14, 2026   03:14:20 pm GMT

# *Johnson v. Metro. Gov't of Nashville & Davidson County*

United States Court of Appeals for the Sixth Circuit

October 18, 2012, Filed

File Name: 12a1087n.06

Nos. 10-6102/11-5174

**Reporter**

502 Fed. Appx. 523 *; 2012 U.S. App. LEXIS 21793 **; 2012 FED App. 1087N (6th Cir.); 2012 WL 4945607

WILLIAM L. JOHNSON, et al., Plaintiffs-Appellants, v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, et al., Defendants-Appellees.

**Notice:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. *SIXTH CIRCUIT RULE 28* LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE *RULE 28* BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**Prior History:  [**1]** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE.

*Johnson v. Metro. Gov't of Nashville & Davidson County, 2011 U.S. Dist. LEXIS 4674 (M.D. Tenn., Jan. 18, 2011)*
*Johnson v. Metro. Gov't, 2008 U.S. Dist. LEXIS 59663 (M.D. Tenn., Aug. 4, 2008)*
*Johnson v. Metro. Gov't of Nashville & Davidson County, 2010 U.S. Dist. LEXIS 87866 (M.D. Tenn., Aug. 24, 2010)*

## Core Terms

candidate, score, district court, disparate impact, rank, roster, deputy chief, diversity, similarly situated, gender, direct evidence, qualification, rollup, summary judgment, eligibility, pretext, prima facie, prevailing party, discriminatory, destroy evidence, animus, pike, supervisor's, memorandum, spoilation, composite, cardinal, male, court's decision, scheduling order

## Case Summary

**Procedural Posture**

Plaintiffs, three police officers employed by defendant police department, appealed the United States District Court for the Middle District of Tennessee's grant of summary judgment in favor of the department and defendants, a City, a County, a former police chief, and other personnel, on the officers' reverse discrimination claims. The officers also appealed several evidentiary rulings and the district court's decision to tax costs against them.

**Overview**

The officers were passed over for promotion as a result of a departmental policy that they alleged favored minority and female candidates. The officers alleged violations of *42 U.S.C.S. § 1983*; Title VII of the 1964 Civil Rights Act; and the Tennessee Human Rights Act, *Tenn. Code Ann. §§ 4-21-401 to 4-21-408*. Defendants ought to have preserved the individual survey scores and they were statutorily obligated to preserve the surveys, but the likelihood that one or several supervisors' improper discrimination materially altered the officers' rollup scores was not likely. Therefore, the surveys were not relevant. No candidate was promoted who fell below a certain line on the surveys and the officers conceded that they scored well below this threshold. As such, they were not similarly situated to those candidates chosen for promotion. There was no evidence to show that defendants disregarded any valid scores and while the officers might have argued that their legitimate expectations were upset by the delayed introduction of the supervisor surveys, they failed to properly allege this argument in their complaint. Accordingly, the officers' disparate impact claim was properly dismissed.

**Outcome**

The district court's judgment was affirmed.

Katherine Baron

# LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Evidence > Relevance > Preservation of Relevant Evidence > Spoliation

Civil Procedure > Discovery & Disclosure > Disclosure > Sanctions

## HN1[⬇] Standards of Review, Abuse of Discretion

An appellate court reviews a district court's decision regarding spoliation of evidence for abuse of discretion. Federal law governs the determination of whether spoliation sanctions are appropriate. A proper spoliation sanction serves both fairness and punitive functions. To accomplish these goals, a district court has broad discretion to order sanctions it deems appropriate, including dismissing the case, granting summary judgment, or imposing an adverse inference based on the lost or destroyed evidence.

Civil Procedure > ... > Jury Trials > Jury Instructions > Requests for Instructions

Evidence > Relevance > Preservation of Relevant Evidence > Spoliation

Civil Procedure > Discovery & Disclosure > Disclosure > Sanctions

## HN2[⬇] Jury Instructions, Requests for Instructions

A three-part standard for determining whether sanctions are appropriate: A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. In applying this three-part standard, the obligation element is met where a defendant knows evidence might be relevant to future potential litigation. Where, however, there is no notice of

potential litigation, there is less cause to believe the evidence was destroyed intentionally or with the intent to cover up incriminating information. Nevertheless, the culpable state of mind element may be satisfied by showing only that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently.

Civil Procedure > Discovery & Disclosure > Disclosure > Sanctions

Evidence > Relevance > Preservation of Relevant Evidence > Spoliation

## HN3[⬇] Disclosure, Sanctions

To the extent bad faith is relevant in a spoliation decision, its most appropriately taken into consideration when adjusting the sanction imposed.

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

## HN4[⬇] Summary Judgment, Evidentiary Considerations

An appellate court reviews a district court's grant of summary judgment de novo. Evidence in the record is viewed in the light most favorable to the nonmoving party, with all reasonable inferences drawn to that party's benefit. Summary judgment is appropriate only where the evidence raises no genuine issues of material fact such that a reasonable jury could return a verdict for the nonmoving party.

Labor & Employment Law > ... > Title VII Discrimination > Scope & Definitions > General Overview

Labor & Employment Law > Discrimination > Disparate Impact > Scope &

Definitions

Labor & Employment
Law > Discrimination > Disparate
Treatment > Scope & Definitions

**HN5[⬇]**]  **Title VII Discrimination, Scope & Definitions**

Title VII of the 1964 Civil Rights Act makes it unlawful for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities" on account of one of the same five grounds listed above. *42 U.S.C.S. § 2000e-2*. There are two principal and distinct means of proving employer discrimination under Title VII: disparate treatment and disparate impact.

Labor & Employment Law > ... > Disparate
Treatment > Evidence > Circumstantial & Direct
Evidence

**HN6[⬇]**]  **Evidence, Circumstantial & Direct Evidence**

Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. Direct evidence must prove not only discriminatory animus, but also that the employer actually acted on that animus.

Labor & Employment Law > ... > Disparate
Treatment > Evidence > Burdens of Proof

**HN7[⬇]**]  **Evidence, Burdens of Proof**

Statements by nondecisionmakers cannot suffice to satisfy a plaintiff's burden of demonstrating animus.

Evidence > ... > Exemptions > Statements by Party
Opponents > Extrajudicial Statements

**HN8[⬇]**]  **Statements by Party Opponents, Extrajudicial Statements**

See *Fed. R. Evid. 801(d)(2)(A)*.

Labor & Employment Law > ... > Disparate
Treatment > Evidence > Circumstantial & Direct
Evidence

**HN9[⬇]**]  **Evidence, Circumstantial & Direct Evidence**

Statements reflecting a desire to improve diversity do not equate to direct evidence of unlawful discrimination.

Labor & Employment
Law > ... > Evidence > Burdens of Proof > Burden
Shifting

Labor & Employment Law > ... > Disparate
Treatment > Evidence > Burdens of Proof

Labor & Employment
Law > Discrimination > Reverse Discrimination

**HN10[⬇]**]  **Burdens of Proof, Burden Shifting**

The Sixth Circuit applies a modified version of the McDonnell Douglas framework in reverse discrimination cases. Claims of reverse employment discrimination brought under the Tennessee Human Rights Act, *Tenn. Code Ann. §§ 4-21-401 to 4-21-408*, also apply the modified McDonnell Douglas standard. First, a plaintiff must present a prima facie case for reverse discrimination showing: (1) that the defendant is that unusual employer who discriminates against the majority; (2) that he was qualified for the position in question; (3) that he suffered an adverse employment action when he was not promoted; and (4) that he was treated differently than other similarly situated employees. If the plaintiff makes out the prima facie case, the burden shifts to the defendant to show a legitimate, non-discriminatory reason behind its actions. Once the defendant meets its burden, the plaintiff must prove that the stated explanation was a pretext for discrimination.

Labor & Employment Law > ... > Disparate
Treatment > Evidence > Burdens of Proof

Labor & Employment
Law > Discrimination > Reverse Discrimination

### *HN11*[⬇] **Evidence, Burdens of Proof**

Establishing the first prong of the prima facie case in a reverse discrimination claim requires plaintiffs to show that defendants are that unusual employer who discriminates against the majority. This requirement is not onerous, and can be met through a variety of means, such as statistical evidence; employment policies demonstrating a history of unlawful racial considerations; evidence that the person responsible for the employment decision was a minority; or general evidence of ongoing racial tension in the workplace. Indeed, the mere fact that a racial minority took an adverse action against the employee is often sufficient to satisfy the background circumstances requirement.

> Labor & Employment Law > ... > Disparate Treatment > Evidence > Burdens of Proof

> Labor & Employment Law > Discrimination > Reverse Discrimination

### *HN12*[⬇] **Evidence, Burdens of Proof**

The background circumstances element only requires a plaintiff to support the suspicion that the defendant is that unusual employer who discriminates against the majority; a plaintiff need not prove that the employer's actions actually were illegally motivated. Requiring the plaintiff to show actual discrimination at this stage conflates the background circumstances element with the remainder of McDonnell Douglas' burden-shifting approach.

> Labor & Employment Law > ... > Disparate Impact > Employment Practices > Demotions & Promotions

> Labor & Employment Law > ... > Employment Practices > Adverse Employment Actions > Demotions & Promotions

### *HN13*[⬇] **Employment Practices, Demotions & Promotions**

In failure-to-promote cases courts only require a plaintiff to show that he possesses similar qualifications to the employee who received the promotion. During the prima facie stage, the inquiry is not finely distinguished, given that it is not realistic from a human standpoint to expect the plaintiff to prove that he has identical qualifications to the chosen candidate. Rather, a court performs a more searching evaluation of the relative qualifications of the two candidates when examining pretext.

> Labor & Employment Law > ... > Employment Practices > Adverse Employment Actions > Demotions & Promotions

### *HN14*[⬇] **Adverse Employment Actions, Demotions & Promotions**

A closer comparison of candidates is appropriate when the parties dispute whether an employee was chosen for promotion based on qualifications versus discriminatory animus. In conducting the evaluation, courts do not act as a super personnel department, overseeing and second guessing employers' business decisions, but rather simply compare characteristics such as differences in job title, responsibilities, experience, and work record, in order to make an informed determination about whether an employment decision was based on pretext.

> Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

> Labor & Employment Law > Discrimination > Disparate Impact > Scope & Definitions

> Labor & Employment Law > ... > Disparate Impact > Evidence > Burdens of Proof

### *HN15*[⬇] **Burdens of Proof, Burden Shifting**

Disparate impact causes of action penalize employment practices that are fair in form but discriminatory in operation. Thus, disparate impact analysis is intended to make sure that employers do not use neutral decision-making mechanisms that in fact work to eliminate a greater portion of otherwise-qualified protected group members than they do members of other groups. Accordingly, a disparate impact claim does not require a showing of intent to discriminate. Instead, the plaintiff must allege that a specific employment practice had an adverse effect on a group of employees, despite its facial neutrality. Disparate impact analysis requires the plaintiff to identify--with specificity--the particular

procedure having an adverse effect. A three-part burden-shifting test is then used to examine a disparate impact claim: (1) the plaintiff must establish a prima facie case for discrimination; (2) the employer may then show that the challenged procedure is justified by business necessity; and (3) the plaintiff can rebut the employer's justification by showing that other tests or selection protocols would serve the employer's interest without creating the undesirable discriminatory effect.

Civil Procedure > Pretrial
Matters > Conferences > Scheduling Conferences

*HN16*[⬇] **Conferences, Scheduling Conferences**

*Fed. R. Civ. P. 16(b)(4)* requires good cause to modify a scheduling order.

Civil Procedure > Pleading & Practice > Motion
Practice > Supporting Memoranda

*HN17*[⬇] **Motion Practice, Supporting Memoranda**

M.D. Tenn. R.7.01(a) requires the filing of an accompanying memorandum of law where a motion may require the resolution of an issue of law.

Civil Procedure > ... > Pleadings > Amendment of
Pleadings > Leave of Court

*HN18*[⬇] **Amendment of Pleadings, Leave of Court**

*Fed. R. Civ. P. 15(a)(2)* provides that a court may freely grant leave to amend a pleading when justice so requires, in order to make certain that a case is tried on its merits rather than on the technicalities of the pleadings. In deciding whether to grant a motion to amend, courts should consider undue delay in filing, lack of notice to the opposing party, and futility of amendment. Unless leave was denied on the basis of futility, an appellate court reviews the district court's decision for abuse of discretion. *Rule 15* provides that leave to amend shall be freely given when justice so requires. *Fed. R. Civ. P. 15(a)*. In the absence of reasons such as those listed, leave should generally be granted. Nevertheless, a district court retains its discretion on such matters, and provided that the court announces a clear reason for its decision, the appellate court will generally defer to its reasoning.

Civil Procedure > ... > Pleadings > Amendment of
Pleadings > Leave of Court

Civil Procedure > Pretrial
Matters > Conferences > Scheduling Conferences

*HN19*[⬇] **Amendment of Pleadings, Leave of Court**

*Fed. R. Civ. P. 15* is augmented by *Fed. R. Civ. P. 16*, which states that the generally wide latitude to amend may be restricted by the court's other scheduling orders. *Fed. R. Civ. P. 16(b)*. *Rule 16* requires that a party seeking to amend outside a scheduling order may do so only on a showing of good cause. This limitation is designed to ensure that at some point both the parties and the pleadings will be fixed. In balancing *Rules 15* and *16*, the appellate court considers the movant's diligence in attempting to meet the case management order's deadlines and whether the opposing party will suffer prejudice by virtue of the amendment.

Civil Procedure > ... > Responses > Defenses,
Demurrers & Objections > Motions to Dismiss

Civil Procedure > Pleading & Practice > Motion
Practice > Supporting Memoranda

*HN20*[⬇] **Defenses, Demurrers & Objections, Motions to Dismiss**

The court may not take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under *Fed. R. Civ. P. 7(a)*.

Civil Procedure > Appeals > Standards of
Review > Abuse of Discretion

Civil Procedure > ... > Costs & Attorney
Fees > Attorney Fees & Expenses > General
Overview

*HN21*[⬇] **Standards of Review, Abuse of Discretion**

An appellate court reviews a district court's award of attorneys costs for abuse of discretion. Awards decisions are fact-intensive and a trial court's determination of those facts is entitled to substantial

deference.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > ... > Costs & Attorney Fees > Costs > General Overview

**HN22**[⬇] **Standards of Review, Abuse of Discretion**

*Fed. R. Civ. P. 54(d)(1)* provides that costs other than attorney's fees should be allowed to the prevailing party. The presumption in favor of awarding costs may only be reversed upon a heavy showing that the court abused its discretion. In order to award costs to a prevailing party, the court must determine that: the expenses are allowable cost items and that the amounts are reasonable and necessary. As long as statutory authority exists for a particular item to be taxed as a cost, the appellate court shall not overturn a district court's determination that the cost is reasonable and necessary, absent a clear abuse of discretion. Thus, the appellate court shall review carefully whether an expense is recoverable, but once it determines that it is, the appellate court defers to the district court, which is in the best position to determine whether the cost is recoverable.

Civil Procedure > ... > Costs & Attorney Fees > Costs > General Overview

**HN23**[⬇] **Costs & Attorney Fees, Costs**

*Fed. R. Civ. P. 54(d)* provides that costs should be allowed to the prevailing party, but it does not specify how to file a bill of costs. M.D. Tenn. R. 54.01 is somewhat more specific and requires that a cost bill, with supporting documentation, shall be filed by the prevailing party. However, this rule does not provide that each prevailing party must file separately.

**Counsel:** For WILLIAM L. JOHNSON (10-6102), JULIAN W. MOORE, KEITH M. HOLLEY, Plaintiff - Appellants: Ann Buntin Steiner, Steiner & Steiner, Nashville, TN.

For METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, METROPOLITAN POLICE DEPARTMENT (10-6102), Defendant - Appellees: Kevin C. Klein, The Klein Law Office, Nashville, TN; Allison L. Bussell, Metropolitan

Department of Law, Nashville, TN.

For RONAL W. SERPAS, Chief, Individually and in his official capacity as Chief of Police, STEVE ANDERSON, Deputy Chief, Individually and in his official capacity as Deputy Chief of Police, HONEY PIKE, Deputy Chief, Individually and in her official capacity as Deputy Chief of Police, JOSEPH BISHOP, Deputy Chief, Individually and in his official capacity as Deputy Chief of Police (10-6102), Defendant - Appellees: Kendra E. Samson, William T. Ramsey, Neal & Harwell, Nashville, TN.

For THE TENNESSEAN (10-6102), Movant - Appellee: Robb S. Harvey, Waller, Lansden, Dortch & Davis, Nashville, TN.

For WILLIAM L. JOHNSON (11-5174), JULIAN W. MOORE, KEITH M. HOLLEY, Plaintiff - Appellants: Ann Buntin Steiner, Steiner **[**2]** & Steiner, Nashville, TN.

For METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE (11-5174), Defendant - Appellee: Kevin C. Klein, The Klein Law Office, Nashville, TN; Allison L. Bussell, Metropolitan Department of Law, Nashville, TN; James William Jeffers Farrar, Metropolitan Govrnment of Nashville and Davidson County, Nashville, TN; Francis H. Young, Metropolitan Department of Law, Nashville, TN.

For METROPOLITAN POLICE DEPARTMENT, RONAL W. SERPAS, Chief, Individually and in his official capacity as Chief of Police, STEVE ANDERSON, Deputy Chief, Individually and in his official capacity as Deputy Chief of Police, HONEY PIKE, Deputy Chief, Individually and in her official capacity as Deputy Chief of Police, JOSEPH BISHOP, Deputy Chief, Individually and in his official capacity as Deputy Chief of Police (11-5174), Defendant - Appellees: James William Jeffers Farrar, Metropolitan Govrnment of Nashville and Davidson County, Nashville, TN; Francis H. Young, Metropolitan Department of Law, Nashville, TN.

For THE TENNESSEAN (11-5174), Movant - Appellee: Alan D. Johnson, Willis & Knight, Nashville, TN.

**Judges:** BEFORE: CLAY and KETHLEDGE, Circuit Judges; DOW, District Judge. *

**Opinion by:** CLAY

# Opinion

---

* The Honorable **[**3]** Robert M. Dow, Jr., United States District Judge for the Northern District of Illinois, sitting by designation.

 [*525]  **CLAY, Circuit Judge.** Plaintiffs William L. Johnson, Julian W. Moore, and Keith M. Holley, police officers employed by Defendant Metropolitan Police Department ("MNPD") of Nashville, Tennessee, appeal the district court's grant of summary judgment on Plaintiffs' reverse discrimination claims. Plaintiffs were passed over for promotion as a result of a departmental policy that they allege favored minority and female candidates. They sued Defendants MNPD; Metropolitan Government of Nashville and Davidson County ("Metro"); MNPD's former chief, Ronal W. Serpas; and other MNPD personnel, alleging violations of *42 U.S.C. § 1983*; Title VII of the 1964 Civil Rights Act, *42 U.S.C. § 2000e*; and the Tennessee Human Rights Act ("THRA"), *Tenn. Code Ann. §§ 4-21-401-4-21-408*. The district court dismissed several of Plaintiffs' claims and, after the parties conducted discovery, granted Defendants' motion for summary judgment. Plaintiffs now appeal that judgment, several evidentiary rulings, and the district court's decision to tax costs against them. For the reasons that follow, we **AFFIRM  [**4]** the district court's judgment in all respects.

## BACKGROUND

### I. The MNPD Promotion Policy

Prior to 2006, it was MNPD's policy to promote officers strictly through the use of standardized tests. An officer applying for a promotion completed a written civil service examination and took part in a performance assessment designed to evaluate the officer's skills and leadership ability. The score received by the officer on each examination was combined into a composite score. The candidates were ranked according to their composite scores, and the departmental chief was required to promote the officers according to ranking, even if the chief believed that a lower-ranked officer was more qualified than a higher-ranked officer.

This policy was the target of criticism in some corners. For one, an outside consultant performed an audit of the MNPD in 2002 and concluded that this method of promoting officers failed to take important criteria into consideration, such as each candidate's managerial skill and past performance. There was also concern about whether the policy inhibited minority candidates from earning promotions, an issue that the local media reported in news articles around 2003. In addition,

 [**5] there was a broader concern internally about the diversity of the MNPD's ranks. For example, Metro and MNPD officials complained to the attorney who represented the police officers union about a lack of diversity in the police force's upper ranks during a meeting regarding negotiations on changes to the promotion policy. These officials  [*526] theorized that the testing scheme exacerbated the problem.

Well before changes were implemented to MNPD's testing system, MNPD officials made other attempts to increase the department's racial diversity. In December 2003, Deputy Chief Anderson wrote a memorandum to acting Chief of Police Deborah Faulkner urging her to promote fifteen officers to the rank of sergeant before the current slate of officers eligible for promotions expired on January 9, 2004 (the "Anderson memo"). According to the memorandum, the current slate of fifteen officers included five minority candidates, but the upcoming list did not include a single minority officer. As the memorandum further explained, because a list of candidates was effective for several years, and because minority candidates reached the candidate list in lower numbers than white candidates under the test-based  [**6] promotions policy, it would be impossible for minority candidates to be promoted if they were not selected from the current slate. Faulkner announced the promotion of several officers shortly after the date of the memorandum, and the group included several minority candidates.

Against this background, MNPD's promotion policy underwent significant change in 2004. Defendant Ronal W. Serpas, who was hired as the MNPD's permanent chief in 2004, shared the prevalent concerns about the test-based promotion policy's soundness. He and Metro's Human Resources Department ("Metro HR") recommended changing the policy, which the Metropolitan Civil Service Commission ("the Commission") did in 2006. Metro hired an outside contractor to design and implement a new policy to replace the test-based promotion policy.

The new policy continues to feature standardized tests, but now also gives the police chief a measure of discretion in deciding whom to promote. Under the new policy, officers must still complete the written civil service examination and skills and leadership assessment. The test results are again combined into a composite score, with the assessment counting for 80% of a lieutenant candidate's  [**7] score, and 70% of a sergeant candidate's score. The candidates are then ranked according to their scores.

However, under the new policy, when the chief prepares to promote an officer, he is given an eligibility roster that lists the seven highest-scoring candidates eligible for promotion to the rank of lieutenant or lists the nine highest-scoring candidates eligible for promotion to sergeant. The roster does not rank the candidates according to their composite scores. Rather, the roster simply lists the officers' names in alphabetical order and does not reveal their scores. Each officer on the list is considered equally qualified for promotion. The chief is not restricted in choosing among candidates from the list. If the chief has multiple vacancies to fill, he can fill them entirely from the roster given to him. If, however, the chief finds that none of the candidates are suitable for promotion, he may also choose to promote none of them, and he may instead request a new roster with the next tier of candidates. If the chief obtains another roster, the Commission removes the names of the candidates not selected and then adds the next highest-scoring candidates.

## II.  [**8] The Disputed Promotions

This litigation concerns several lieutenant and sergeant vacancies that became available during 2006 and 2007. Plaintiffs Johnson and Moore applied for promotions to lieutenant, and Plaintiff Holley applied to become a sergeant. Each officer was passed over and now contends that considerations of race and gender improperly affected Serpas' promotion decisions.

 [*527]  Serpas made his selections in three separate rounds between October 2006 and May 2007. Moore's composite test score ranked him seventh overall, and therefore his name appeared on the first roster submitted to Serpas. Moore was not selected, in spite of the fact that a commander allegedly invited Moore to a meeting of higher-ranked officers under the expectation that Moore would be promoted. Johnson was ranked ninth among the candidates and was therefore not on the first roster given to Serpas. Johnson's name appeared on the second roster that was submitted to Serpas, and Serpas did not select Johnson for promotion. According to Johnson and Moore, three female candidates and two black male candidates ranked lower than them were selected instead. Moore and Johnson contend that only race and gender can account  [**9] for the fact that these candidates were selected in front of them. Defendants note, however, that three white male candidates who ranked below both Moore and Johnson also were selected for promotion.

For his part, Holley was ranked as a "police officer II" and applied to become a sergeant around the same period. Serpas made selections for the sergeant positions in three separate rounds between February and September 2007. Like Johnson, Holley was not on the first roster submitted to Serpas, because Holley's composite test score ranked him sixteenth among the sergeant candidates. In his affidavit testimony, Holley asserted his name eventually moved up into the roster for promotion, but that twenty-nine officers were eventually promoted to sergeant instead of him. Holley does not allege how many female and black male officers were promoted in front of him, but he contends that the highest-ranked black male officer in the initial rankings was ranked tenth and that the next-highest-ranked black male officer was ranked lower than twentieth. In their defense, Defendants assert that Serpas promoted eleven white males who obtained composite scores lower than Holley and declined to promote one  [**10] white female who scored below Holley.

Plaintiffs nonetheless contend that Serpas and other MNPD supervisors abused the discretion granted them under the new promotion policy in order to favor promotions of minority and female candidates. In support of their contention, they cite, in addition to Serpas' selections noted above, several statements that MNPD officials made to local newspapers. For example, MNPD spokesperson Dan Aaron explained the department's rationale for the changes to the promotion policy to *The Tennessean* in October 2006. The article stated:

> Promoting the best candidates possible was the priority, and the chief was pleased there were diverse candidates to pick from near the top of the list, Aaron said.

> "The goal of this police department is to mirror the population of the city to the greatest extent possible," Aaron said. "When presented with the opportunity to promote bright, qualified minority candidates, you always give those persons consideration."

*The Tennessean* wrote another article about the promotions in April 2007, this time emphasizing non-minority officers' complaints about the policy. Aaron was again quoted, this time saying, "[i]f you have two candidates  [**11] who are essentially equal and believe that both would make very good supervisors, and if your choice is to make the department more diverse, you

would probably elect to include diversity in your choice." In an article from another local news agency, Aaron was quoted as saying that MNPD changed its promotion policy in order to increase diversity among MNPD leadership.

**[\*528]  III. The Anonymous Supervisor Surveys**

According to Plaintiffs, their claims of reverse discrimination gain further support by Serpas' decision to use anonymous surveys completed by the candidates' supervisors as part of his selection process. At some point in 2006 or 2007, Serpas directed Eric Cardinal, an MNPD technology analyst, to develop a computer-based survey for department supervisors to fill out in order to report their assessments of the various lieutenant and sergeant candidates. As we explain below, Cardinal developed the program and disbursed it digitally to the supervisors, who completed the surveys prior to each round of promotions. Serpas used the surveys as part of his decision about whom to promote. While the instructions for the surveys are in the record, the surveys themselves are not available to us, **[\*\*12]** because Serpas directed Cardinal to dispose of them once Serpas was finished using them. Plaintiffs contend that in allowing the surveys to be deleted, Defendants violated federal law and breached their discovery obligations. Upon learning of the destruction of the surveys, Plaintiffs moved for a default judgment or, alternatively, a negative inference against Defendants. The district court denied both requests.

Cardinal described the survey in his deposition testimony. Cardinal sent an email to the appropriate supervisors that contained an internet link, which, when clicked, opened a page on the MNPD's intranet. The supervisor was directed to fill in the log-in information and was then given a set of instructions (which are contained in the record). The supervisor then arrived at the survey form, titled "Promotion Readiness and Potential Ratings for Sergeant Candidates," with the lieutenant survey accompanied by a similar title. The survey form explained that the survey's purpose was "to seek the opinions of supervisory and management personnel who have worked directly with, or otherwise have personal awareness of the skills, abilities, and knowledge possessed by, candidates eligible **[\*\*13]** for promotion to the rank of Sergeant [and Lieutenant] as to their overall readiness and skill." The instructions directed the supervisor to "consider the candidate's potential to lead, manage resources, and successfully perform the duties that he or she will be required to perform."

The supervisor was then asked to rate each candidate in several categories on a scale of 1 to 3, with 1 standing for "lowest potential" and 3 standing for "highest potential." In the interest of creating a spread in the candidates' scores, the supervisor was only allowed to award a certain number of 3, 2, and 1 rankings. The supervisor was instructed not to complete a survey for a candidate with whom he was not sufficiently acquainted. When the supervisor completed the survey, the computer program added his ratings to those of other supervisors regarding a particular candidate. When all the supervisors had completed their surveys, the computer program generated an average score for that candidate, referred to by the parties as a "rollup" score. Supervisors at and above the rank of lieutenant completed surveys for the lieutenant candidates, and supervisors at and above the rank of sergeant completed surveys **[\*\*14]** for the sergeant candidates.

After the supervisors completed each round of surveys, Serpas examined each candidate's rollup score. The rollup score showed each candidate's name, the number of supervisors who rated him, and the candidate's raw and average scores. After Serpas examined the rollups, Cardinal deleted the data and notified Serpas that he had done so. Cardinal could have designed the program to save the data, but **[\*529]** Serpas did not direct him to do so. Serpas did, however, save the rollup scores for each candidate, and Defendant turned that evidence over to Plaintiffs during discovery.

In his deposition testimony, Serpas testified that he requested the computerized survey because he had not personally met many of the promotion candidates in his three years of leading the MNPD. He testified that he made his promotion decisions after considering the candidates' employment, sick leave, and disciplinary records; their assignment positions; their educational and training experiences; and any citizen complaints filed against them. According to Serpas, the surveys added to the pool of information he used in his selections, and their simplified format allowed him to avoid the time required **[\*\*15]** to personally interview each supervisor about each candidate. Serpas did not keep any notes documenting his promotion decisions. As Plaintiffs point out, the personnel files Serpas consulted disclosed the race and gender of each candidate. Nevertheless, Serpas testified that race and gender played no part in his decision and that he chose other candidates over Plaintiffs because he decided

those candidates "were more likely to be successful" than Plaintiffs.

As a general matter, Serpas did not promote any candidate with an average rollup score below 2.0, and each Plaintiff in the instant case scored below that threshold on each of the three supervisor surveys conducted on their performance. Moore received average scores of 1.58 from twelve supervisor surveys in the first round, 1.59 from seventeen supervisor surveys in the second round, and 1.61 from eighteen supervisors in the final round. Johnson received average scores of 1.56 from sixteen supervisors in the first round, 1.58 from twelve supervisor surveys in the second round, and 1.67 from twelve supervisor surveys in the third round. Holley was scored on only two rounds of surveys, and in both rounds thirty-three supervisors scored **[\*\*16]** him for scores of 1.42 and 1.70. These scores placed each Plaintiff near the bottom of their candidate pools.

Nevertheless, Plaintiffs offer several reasons for which they believe that Serpas' use of the surveys was improper. First, Plaintiffs allege that they were not made aware that the surveys would be used as a basis of Serpas' decision, and they argue that it was unfair for Serpas to use the procedure when it had not been disclosed to the candidates. Plaintiffs also consider it improper that a different number of supervisors rated them during each round of surveys. In response, Defendants contend that this inconsistency was actually a virtue of the surveys, because, in their view, it demonstrates that the supervisors followed the survey directions not to rate the candidates with whom they were unacquainted. Finally, Plaintiffs contend that Serpas used the surveys as a subterfuge to favor minority and female candidates, and they argue that he allowed Cardinal to destroy the surveys in order to hide the department's reverse discrimination.

### IV. Plaintiffs' Meetings with their Supervisors and Human Resources

After Serpas made his selections, Moore, Johnson, and Holley sought explanations **[\*\*17]** for their non-promotion from department officials. Moore and Johnson met separately with MNPD Deputy Chiefs Steve Anderson, Honey Pike, and Joseph Bishop. In his meeting, Johnson asked the deputy chiefs what information the department used to decide whom to promote. The deputy chiefs told him generally that they used many types of information. Johnson asked the

panel whether his work history was used in the decision, and **[\*530]** he asserts that Deputy Chief Anderson answered in a manner suggesting that he did not know whether that information was considered. Johnson told the panel that he believed he was the victim of reverse discrimination and asked the deputy chiefs to investigate his complaint, but he alleges that the deputy chiefs never did so.

Johnson also spoke with other MNPD officials and purportedly received information that supported his view that female and minority candidates received favorable treatment. He spoke with a commander who allegedly told him that "diversity issues needed to be dealt with" in the promotions process. Johnson also spoke with an official within Metro HR. When Johnson asked the official whether the candidates' race and gender affected the promotions decision, **[\*\*18]** the official allegedly answered, "We all know what happened, if you know what I mean."

Moore also discussed his complaint with the deputy chiefs and recorded his conversation. Moore repeatedly raised the issue of race and its effect on the promotions decision, in response to which Deputy Chief Pike conceded that MNPD did not reflect the community's racial and gender diversity. However, Deputy Chief Pike also insisted that the promotion policy was aimed at identifying the most qualified candidates, regardless of minority status. According to Moore, Deputy Chief Pike urged Moore to examine his own performance, evaluate whether he deserved a promotion, and discuss his performance with his direct supervisors. Moore told the deputy chiefs that he had done so and concluded that he possessed the qualities required to serve as a lieutenant. Like Johnson, Moore expressed his belief that he was the victim of reverse discrimination, but the deputy chiefs allegedly did not investigate the complaint.

Finally, Holley discussed his failure to earn a promotion with the three deputy chiefs as well. According to Holley, none of the deputy chiefs offered him useful information about why he was not promoted. **[\*\*19]** Holley explained that his direct supervisor urged him to reapply for a promotion. He also said that he was more involved in community affairs than other officers and was often approached by other officers for answers about departmental policy and the law. Nevertheless, according to Holley, the deputy chiefs simply gave him a piece of paper listing thirty-three names with his name thirty-second among the list.

## V. Procedural History

Dissatisfied with the department's promotion decisions, Plaintiffs filed two separate suits in federal district court. Johnson and Moore sued in September 2007, alleging violations of the *Equal Protection Clause of the United States Constitution*, *42 U.S.C. § 1983*, and the THRA. After Johnson and Moore received right-to-sue letters from the Equal Employment Opportunity Commission, they added claims of disparate impact and disparate treatment under Title VII. For his part, Holley filed a similar suit in January 2008, though his complaint contained no Title VII claims, and he did not sue the MNPD. The district court eventually consolidated the cases.

Defendants Pike, Bishop, Anderson, and MNPD filed successful motions to dismiss and all claims against them were **[\*\*20]** dismissed on May 13, 2008. [1] *See Johnson v. Metro. [\*531] Gov't of Nashville & Davidson Cnty., Tenn., Nos. 3:07-0979, 3:08-0031, 2008 U.S. Dist. LEXIS 38743, 2008 WL 2066475 (M.D. Tenn. May 13, 2008)* ("*Johnson I*"). Plaintiffs do not appeal those rulings.

Shortly thereafter, Metro filed a separate motion to dismiss Johnson and Moore's disparate impact claim. [2] (RE 68, Mot. to Dismiss.) Plaintiffs filed a response and also sought leave to amend their complaint. The district court denied Plaintiffs' motion and dismissed the disparate impact claim. *Johnson v. Metro. Gov't of Nashville & Davidson Cnty., Nos. 3:07-0979, 3:08-0031, 2008 U.S. Dist. LEXIS 59663, 2008 WL 3163531 (M.D. Tenn. Aug. 4, 2008)* ("*Johnson II*").

Following those rulings, Plaintiffs' remaining claims asserted that **[\*\*21]** Metro and Serpas violated the *Equal Protection Clause* and Defendants' rights as protected by Title VII and the THRA. Defendants moved for summary judgment in June 2010. During the same month, Plaintiffs moved for a default judgment or,

---

[1] The federal claims against the officers were dismissed on the basis of qualified immunity. *Johnson I, 2008 U.S. Dist. LEXIS 38743, 2008 WL 2066475, at \*4*. The state claims against the officers were dismissed for insufficiency of the allegations. *2008 U.S. Dist. LEXIS 38743, [WL] at \*8*. The claims against MNPD were dismissed because it is not an entity capable of being sued under Tennessee law. *2008 U.S. Dist. LEXIS 38743, [WL] at \*8 n.5*. By state statute, all claims against the MNPD must be pursued against Metro. *Id.*

[2] Holley did not assert a disparate impact claim.

alternatively, for an adverse finding against Defendants, based upon Defendants' failure to completely preserve the records from the supervisor surveys.

On August 24, 2010, the district court denied Plaintiffs' motions for a default judgment and an adverse factual finding, granted summary judgment in favor of Defendants, and entered judgment on all claims in favor of Metro and Serpas. *Johnson v. Metro. Gov't of Nashville, Nos. 3:07-0979, 3:08-0031, 2010 U.S. Dist. LEXIS 87866, 2010 WL 3342211 (M.D. Tenn. Aug. 24, 2010)* ("*Johnson III*").

In November 2010, the clerk of the court taxed costs against Plaintiffs. The clerk awarded to Metro the costs of defending both Metro and Serpas. Plaintiffs challenged the clerk's taxation of costs, but the district court upheld the award. *Johnson, et al. v. Metro. Gov't of Nashville, Nos. 3:07-0979, 3:08-0031, 2011 U.S. Dist. LEXIS 4674, 2011 WL 166320 (M.D. Tenn. Jan. 18, 2011)* ("*Johnson IV*").

Plaintiffs timely appealed the district court's rulings. Original jurisdiction exists **[\*\*22]** pursuant to *28 U.S.C. §§ 1331* and *1367*. This Court exercises jurisdiction pursuant to *28 U.S.C. § 1291*.

## DISCUSSION

### I. Spoliation of Evidence

Before addressing the merits, we turn first to Plaintiffs' claim that the district court erred in refusing to impose sanctions against Defendants for spoliation of evidence. Plaintiffs contend that they are entitled an inference of discriminatory animus or to a directed verdict because Defendants failed to preserve the individual results of the supervisor surveys and thereby purposefully deprived Plaintiffs of valuable information supporting their claims of reverse discrimination.

*HN1*[↑] This Court reviews a district court's decision regarding spoliation of evidence for abuse of discretion. *Beaven v. U.S. Dep't of Justice, 622 F.3d 540, 553 (6th Cir. 2010)* (citing *Adkins v. Wolever, 554 F.3d 650, 652 (6th Cir. 2009)* (en banc)). Federal law governs the determination of whether spoliation sanctions are appropriate. *Adkins, 554 F.3d at 652*. A proper spoliation sanction serves both fairness and punitive functions. *Id.* To accomplish these goals, a district court has "broad discretion" to order sanctions it deems appropriate, including dismissing the case, granting

 [**23] summary judgment, or imposing an adverse inference based on the lost or destroyed evidence. *Id.* Recently, this Court articulated *HN2*[↑] a three-part standard for determining whether sanctions are appropriate:

> [A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party [*532] having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind;" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Beaven, 622 F.3d at 553* (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002)* (citation omitted)).

In applying this three-part standard, we explained that the obligation element is met where a defendant knows evidence might be relevant to future potential litigation. *Id.* Where, however, there is no notice of potential litigation, there is less cause to believe the evidence was destroyed intentionally or with the intent to cover up incriminating information. See *id.* Nevertheless, we also noted that [**24] the "culpable state of mind" element may be satisfied by showing only that "the evidence was destroyed 'knowingly, even if without intent to breach a duty to preserve it, or negligently.'" *Id.* (internal citation, brackets, quotations omitted).

In the instant case, Plaintiffs argue that Metro was obligated to preserve the individual survey results scored by each supervisor, in addition to the averaged rollup scores. Plaintiffs cite several regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") and pursuant to Title VII that obligate employers to preserve employment "records." *See 42 U.S.C. §§ 2000e-8, 2000e-12; 29 C.F.R. § 1602.31.* Defendants counter that employers are not required to keep every single piece of paper created during the employment process, *see Rummery v. Ill. Bell Tel. Co., 250 F.3d 553, 558 (7th Cir. 2001)*, and that the rollup scores were sufficient to satisfy their statutory preservation obligations.

We agree with the district court that Defendants ought to have preserved the individual survey scores. The surveys were part of, and indeed played an integral role in, a significant change to an already controversial promotion system. Whether through [**25] formal litigation or otherwise, it was reasonably foreseeable that Defendants would face some sort of challenge to the new promotions system. Defendants should have anticipated that officers who were passed over for promotion might question that decision and that Defendants would need to defend their selections. By deleting the individual surveys, Defendants also deprived the officers of valuable information regarding their individual performance, their likelihood for future promotion, and information that might have been used in litigation. Regardless of whether the rollups were the most efficient way for Serpas to review the survey results, the individual scores had value warranting their preservation beyond his decision-making process.

Furthermore, Defendants were statutorily obligated to preserve the surveys under EEOC and Title VII regulations. The individual surveys are more properly viewed as records in and of themselves, rather than the "rough drafts" or "processes" used to create a final employment record. *See id. at 558.* Finally, it was technologically and logistically feasible to retain the survey data, and Defendants have provided no convincing explanation for why they failed [**26] to do so.

Having determined that Defendants were obligated to preserve the surveys, the next question is whether Defendants destroyed the evidence with requisite culpable state of mind. Plaintiffs contend that this element is satisfied because the records were destroyed "knowingly" or "negligently" even if the Chief acted "without [the specific] intent to breach [his] [*533] duty" to preserve. *See Beaven, 622 F.3d at 553.* The district court rejected this argument, reasoning that Plaintiffs could not show that Serpas "acted in bad faith." *Johnson III, 2010 U.S. Dist. LEXIS 87866, 2010 WL 3342211, at *19.*

The district court erred by injecting a bad faith component into its spoilation analysis. In *Adkins*, we recognized that there may be a "continuum of fault ranging from innocence through the degrees of negligence to intentionality." *554 F.3d at 652-653.* *HN3*[↑] To the extent bad faith is relevant in a spoilation decision, its most appropriately taken into consideration when adjusting the sanction imposed. In the instant case, the record shows that Serpas deliberately chose not to preserve the results and deliberately ordered the destruction of the individual surveys. Although there is no evidence to show that he acted out of bad [**27] faith, his conduct was nevertheless intentional

and therefore meets the "culpable state of mind" element.

Finally, Plaintiffs must prove that the destroyed surveys are "relevant" to their claims of reverse discrimination. This, however, is where Plaintiffs' request for sanctions must fail. The information Plaintiffs wishes was preserved is of minimal relevance to proving their case for reverse discrimination. First, the surveys themselves were a rather blunt instrument for measuring the supervisors' opinions. The individual results would have consisted only of a string of each supervisor's scoring, rated on a simple 1-to-3 scale, based on instructions which asked the supervisors to take into account a host of qualities demonstrating promotional readiness. The instructions did not tell the supervisors to consider race, gender, or diversity, and to the extent that such motives improperly influenced the scores, they likely would not be immediately apparent from the surveys' simplistic numerical system.

In order to link discriminatory intent to the surveys, Plaintiffs would have to examine each supervisor's rankings for patterns of race or gender discrimination. However, the record does **[\*\*28]** not indicate that the program was enabled in such a way as to accomplish this. Although the supervisors used a log-in "name" and password to access the surveys, the record is unclear as to whether the supervisor's identity was saved alongside with the survey results. Moreover, even if that information was available, multiple inferences would be required to connect the individual surveys relevancy to Plaintiffs' claims. Plaintiffs would need to demonstrate not only an individual supervisor's pattern of discrimination, but also that the pattern of discrimination adversely affected the aggrieved candidate's averaged scores in comparison to his minority counterparts, and by consequence, Serpas' evaluation of the rollup scores. These serious hurdles attenuate the surveys from the ultimate promotion decision at multiple levels. As the proximate causation of the surveys weakens, so does their relevance. Moreover, as we mentioned above, Plaintiffs scored significantly below their promoted counterparts on the supervisor surveys. Accordingly, the likelihood that one or several supervisors' improper discrimination materially altered Plaintiffs' rollup scores is even less likely. The only other **[\*\*29]** way Plaintiffs can conceivably prove the surveys' relevance is by claiming that the rollups were fabricated. Plaintiffs do not seriously press this argument. [3]

---

[3] Officer Holley argues that he was only supervised by ten supervisors in his direct chain of command; therefore, the

**[\*534]** Consequently, the district court did not abuse its discretion in denying sanctions.

## II. Reverse Discrimination Claims

### A. Standard of Review

*HN4*[⬆] We review a district court's grant of summary judgment *de novo. Wuliger v. Mfrs. Life Ins. Co., 567 F.3d 787, 792 (6th Cir. 2009)*. Evidence in the record is viewed in the light most favorable to the nonmoving party, with all reasonable inferences drawn to that party's benefit. *Combs v. Int'l Ins. Co., 354 F.3d 568, 576-77 (6th Cir. 2004)* (citing *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970))*. Summary judgment is appropriate only where the evidence raises no genuine issues **[\*\*30]** of material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

### B. Statutory Framework

*HN5*[⬆] Title VII makes it unlawful for an employer "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities" on account of one of the same five grounds listed above. *42 U.S.C. § 2000e-2*. There are two principal and distinct means of proving employer discrimination under Title VII: disparate treatment and disparate impact. *Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971)*. We address Plaintiffs' claims of disparate treatment first.

### C. Disparate Treatment Claims

---

rollup indicating that he was ranked by thirty-three supervisors is suspect. However, Officer Holley misconstrues the survey instructions, which asked the supervisors to rank any candidate whom they "worked directly with or otherwise [had] personal awareness of the skills, abilities, and knowledge of."

**1. Direct Evidence of Reverse Discrimination**

Plaintiffs first contend that they offered direct evidence of discrimination proving that they were treated disparately from their **[\*\*31]** minority counterparts. Specifically, Plaintiffs cite to (1) the 2003 Anderson memo; (2) Aaron's public remarks to *The Tennessean*; and (3) the comments made by Commander Nash, Deputy Chief Pike, and Metro HR representative Sinor in their meetings with Plaintiffs.

*HN6*[⬆] Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Amini v. Oberlin Coll., 440 F.3d 350, 359 (6th Cir. 2006)*; *Grizzell v. City of Columbus Div. of Police, 461 F.3d 711, 719 (6th Cir. 2006)* (quoting *Kocak v. Cmty. Health Partners of Ohio, Inc., 400 F.3d 466, 470 (6th Cir. 2005))*. Direct evidence must prove not only discriminatory animus, but also that the employer actually acted on that animus. *See Amini, 440 F.3d at 359*. For the following reasons, none of Plaintiffs' proposed evidence meets this standard.

The Anderson memo does not constitute direct evidence because it would require multiple inferences to reach a finding of discrimination. First, the memo is three years removed from the events of this case, and from it we would need to infer that Anderson's opinions in 2003 motivated his actions in 2005-2006. *See, [\*\*32] e.g., Phelps v. Yale Sec., Inc., 986 F.2d 1020, 1025-26 (6th Cir. 1993)* (rejecting statements made about the plaintiff nearly a year prior to his layoff). Additionally, Deputy Anderson was not the decisionmaker in the promotions process. Rather, Serpas was responsible for the disputed promotions, and Deputy Anderson only participated in the process by completing **[\*535]** supervisor surveys. *See Smith v. Leggett Wire Co., 220 F.3d 752, 759 (6th Cir. 2000)* (*HN7*[⬆]] "Statements by nondecisionmakers cannot suffice to satisfy the plaintiff's burden of demonstrating animus." (quoting *Price Waterhouse v. Hopkins, 490 U.S. 228, 277, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)* (O'Connor, J., concurring) (internal quotations omitted)).

Next, Plaintiffs point to several statements allegedly made by MNPD spokesperson Don Aaron to local newspapers in 2006 and 2007. Aaron was quoted as stating, "If you have two candidates that are essentially equal and believe that both would make very good supervisors, and if your choice is to make the department more diverse, you would probably elect to include diversity in your choice." Aaron was also quoted as saying, "The goal of this police department is to mirror the population of the city to the greatest extent **[\*\*33]** possible . . . . When presented with the opportunity to promote bright, qualified minority candidates, you always give those persons consideration."

The district court disregarded these statements as inadmissible hearsay. Plaintiff contends that the district court's evidentiary ruling was incorrect because Aaron's comments should have been considered a statement by a party-opponent. *HN8*[⬆]] *See Fed. R. Evid 801(d)(2)(A)* (a "party's own statement in either an individual or a representative capacity" is not hearsay if "offered [against] the party").

We need not consider the district court's evidentiary ruling, because even if admissible, Aaron's statements are not direct evidence of discrimination. Aaron's first statement—answering a hypothetical question about "equally qualified candidates"—requires an inference because the statement did not refer to this employment decision.

Nor is Aaron's second comment direct evidence of discrimination, because it would require us to ignore the equally available inference that the department was simply aware of a lack of minorities within its upper ranks. As we have held, however, *HN9*[⬆] statements reflecting a desire to improve diversity do not equate to direct evidence **[\*\*34]** of unlawful discrimination. *See Plumb v. Potter, 212 F. App'x 472, 477-78 (6th Cir. 2007)* ("[A] jury could find that [the employer] believed it was good to have more women working at the [company], yet still conclude that [the decisionmaker] did not let that personal belief interfere with her decision whether or not to promote a woman over [the plaintiff].")

Finally, the statements allegedly made by Commander Nash, Deputy Chief Pike, and HR representative Sinor do not constitute evidence of direct discrimination because there is no evidence to show that these individuals were decisionmakers in the promotion process. *See Smith, 220 F.3d at 759-60*. Plaintiffs' attempt to raise a cat's-paw argument about these individuals is also ineffective, because it would require us to draw inferences that are inappropriate under direct discrimination analysis. [4] *See Ercegovich v. Goodyear*

---

[4] The "rubber-stamp" or "cat's paw" theory of liability involves a

*Tire & Rubber Co., 154 F.3d 344, 355 (6th Cir. 1998)*. Accordingly, Plaintiffs have failed to produce direct evidence of reverse discrimination.

### 2. Circumstantial Evidence of Reverse Discrimination

Because Plaintiffs cannot prove reverse discrimination by way of direct evidence, they must rely on circumstantial evidence. **[*536]** *HN10*[⬆] This Circuit applies a modified version of the *McDonnell Douglas* framework in reverse discrimination cases. *See Leadbetter v. Gilley, 385 F.3d 683, 690 (6th Cir. 2004)* (citing *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973))*. Claims of reverse employment discrimination brought under the THRA also apply our modified *McDonnell Douglas* standard. *See, e.g., Newman v. FedEx, 266 F.3d 401, 406 (6th Cir. 2001)*.

First, Plaintiffs must present a *prima facie* case for reverse discrimination showing: (1) that the Defendant "is that unusual employer who discriminates against the majority;" (2) that they were qualified for the position in question; (3) that they suffered an adverse employment action when they were not promoted; and (4) that they were treated differently than other similarly situated employees. *Arendale v. City of Memphis, 519 F.3d 587, 603-04 (6th Cir. 2008)*. If Plaintiffs make out their *prima facie* case, **[**36]** the burden shifts to Defendants to show a legitimate, non-discriminatory reason behind their actions. *Id. at 603*. Once Defendants meet their burden, Plaintiffs must prove that the stated explanation was a pretext for discrimination. *Id.*

### a. Background Circumstances

*HN11*[⬆] Establishing the first prong of the *prima facie* case in a reverse discrimination claim requires Plaintiffs to show that Defendants are that "unusual employer who discriminates against the majority." *Id. at 603-04*. This requirement is not onerous, and can be met through a variety of means, such as statistical evidence; employment policies demonstrating a history of unlawful racial considerations; evidence that the person responsible for the employment decision was a minority;

or general evidence of ongoing racial tension in the workplace. *See Treadwell v. Am. Airlines, 447 F. App'x 676, 678 (6th Cir. 2011)* (citing cases). Indeed, "the mere fact that a racial minority took an adverse action" against the employee is often sufficient to satisfy the background circumstances requirement. *Leavey v. City of Detroit, 467 F. App'x 420, 425 (6th Cir. 2012)* (citing *Arendale, 519 F.3d at 603*).

Plaintiffs allege that a background of reverse **[**37]** discrimination may be inferred from: (1) the 2003 Anderson memo; (2) the statements made by Commander Nash, Chief Pike, and HR representative Sinor in the meetings Plaintiffs requested after being passed over for promotion; (3) the fact that Serpas was "chief for a political entity" and motivated to "appease the population of Nashville"; and (4) two unrelated discrimination cases brought against Metro. The district court found this evidence insufficient to prove background circumstances, because there was no evidence to conclude that Defendants' actually unlawfully considered race or gender as factors in the making specific employment decisions. *Johnson III, 2010 U.S. Dist. LEXIS 87866, 2010 WL 3342211, at *16*.

In so reasoning, the district court went too far. *HN12*[⬆] The background circumstances element only requires a plaintiff to "*support the suspicion* that the defendant is that unusual employer who discriminates against the majority;" a plaintiff need not prove that the employer's actions *actually* were illegally motivated. *Boger v. Wayne Cnty., 950 F.2d 316, 324-25 (6th Cir. 1991)* (emphasis added). Requiring Plaintiffs to show actual discrimination at this stage conflates the background circumstances element with the **[**38]** remainder of *McDonnell Douglas*' burden-shifting approach. *See Treadwell, 447 F. App'x at 679* (noting that requiring a plaintiff to produce both "the foreground and background evidence to reach a jury" incorrectly collapses the background circumstances prong into *McDonnell Douglas*' other elements).

**[*537]** As is required on summary judgment, we must draw disputed inferences in Plaintiffs' favor and conclude that Plaintiffs have met the background circumstances element. Plaintiffs supplied sufficient evidence to raise at least a material issue of fact that there was ongoing racial tension within the MNPD, and particularly, tension surrounding the manner in which promotions were being awarded within the department's ranks. *See, e.g., id. at 678*; *Boger, 950 F.2d at 324-25*; *McCloud v. Testa, 97 F.3d 1536, 1549 (6th Cir. 1996)*;

---

situation where a supervisor is influenced by another individual who was motivated by an impermissible bias. **[**35]** It is more appropriately dealt with in circumstantial evidence review. *See Arendale, 519 F.3d at 604*.

*Zambetti v. Cuyahoga Cmty. College, 314 F.3d 249, 256 (6th Cir. 2002)*. Plaintiffs presented depositions by persons at all levels of MNPD's hierarchy who testified that the department was interested in promoting diversity and that it was acutely conscious of its long history of racial and gender imbalance. [5] And while the district court was correct that such a focus may only **[\*\*39]** reflect a legitimate desire to comply with equal opportunity requirements, it also presents a context sufficient to meet the background circumstances element.

### b. Qualifications and Similarly Situated Candidates

As to the remaining prongs of Plaintiffs' *prima facie* case, Plaintiffs suffered an adverse employment decision when they were passed over for promotion, but Defendants dispute whether Plaintiffs were qualified for promotion and similarly situated to the promoted candidates. These prongs touch on essentially the same issues, **[\*\*40]** so we address them together.

Whether Plaintiffs were qualified for promotion and similarly situated to the promoted candidates depends partly upon how we compare the candidates. The district court disregarded the surveys in deciding the qualification issue, but considered them in its similarly situated analysis. We agree with this approach.

Under the new scoring procedure, candidates who received the highest scores were placed on the eligibility roster in alphabetical order without revealing the composite scores. We agree with the district court that this procedure meant that all candidates whose names appeared on the roster were deemed qualified for promotion. *Johnson III, 2010 U.S. Dist. LEXIS 87866, 2010 WL 3342211, at \*3*. Hence, we need not take into account the candidates' survey scores when considering

---

[5] We note the same figure that the consulting company found troubling: that, as of 2003, there were a total of 29 African-American supervisors out of 1,300 sworn MNPD officers. Certainly such a statistic could prompt Defendants to be concerned about the need for greater diversity in the department's ranks.

To a lesser extent, we also take judicial notice of the newspaper articles reflecting dissatisfaction by both minority and majority officers with MNPD's promotions processes. *See* "Officers Say Metro Police Promotions Policy Unfair," *The Tennessean*, Apr. 2, 2007; "Racial Tensions Escalate—Black & White Cops Feud over Promotions, *Nashville Scene*, Oct. 2, 2003.

the qualification element, and we conclude that Plaintiffs have met their burden to prove that they were qualified for promotion.

By contrast, a candidate's score is relevant in deciding whether Plaintiffs were similarly situated to the officers that were selected for promotion. Inclusion on the eligibility roster only qualified a candidate for promotion, but did not guarantee it. Because the chief had the discretion **[\*\*41]** to choose among candidates, a candidate could be passed over for promotion entirely or promoted later than a comparatively lower-scored candidate.

Accordingly, the revised system established a two-stage promotions process. Scoring well on the written and assessment tests was not a guaranteed basis for **[\*538]** promotion; it only qualified a candidate for promotion. At the second stage, the chief held the sole discretion to choose among candidates. The system did not limit the considerations the chief could take into account, which could conceivably include a wide variety of qualities, including: education, training, length of service, readiness, ability to lead, disciplinary infractions, or a host of other factors. Any of these factors might distinguish Plaintiffs from their promoted peers and render Plaintiffs not similarly situated.

We have explained that *HN13*[⬆] in failure-to-promote cases we only require a plaintiff to show that he possesses "similar qualifications" to the employee who received the promotion. *Provenzano v. LCI Holdings, Inc., 663 F.3d 806, 814 (6th Cir. 2011)*. During the *prima facie* stage, our inquiry is not finely distinguished, given that it "is **[\*\*42]** not realistic from a human standpoint" to expect the plaintiff to prove that he has identical qualifications to the chosen candidate. *Id.* Rather, we perform a "more searching evaluation of the relative qualifications of the two candidates" when examining pretext. *Id. at 816*. However, even if we granted leniency to Plaintiffs at the *prima facie* stage, they still have made no effort whatsoever to show that they were similarly situated to the chosen candidates on even the most basic level. Plaintiffs utter failure to address the similarly situated element fatally undercuts their *prima facie* case, as well as their argument for pretext.

Moreover and as noted above, the survey results are appropriately considered when evaluating the similarly situated element. In the instant case, the survey results render Plaintiffs dissimilar from the candidates who were selected for promotion. Serpas ordered the surveys in an effort to capture the supervisors' opinions

as to which candidates were most suited for promotion. These opinions were considered, along with each candidate's personnel record and overall qualifications, when Serpas made his promotions decisions. And while Serpas did not take notes **[\*\*43]** about his decisions, he testified that he did draw at least one clear line in his reasoning; he did not promote any candidate whose rollup score fell below a "2.0"

In fact, no candidate was promoted who fell below that line, and Plaintiffs concede that they scored well below this threshold. As such, they were not similarly situated to those candidates chosen for promotion. *See Gaffney v. Potter, 345 F. App'x 991, 993 (6th Cir. 2009)* (holding that differences in performance ratings render two employees not similarly situated). Accordingly, Plaintiffs' *prima facie* case fails because they have failed to show that they were similarly situated to the promoted candidates.

### c. Pretext

Although Plaintiffs have not met their *prima facie* burden, we note that similar deficiencies prevent them from demonstrating pretext.

Serpas explained that he did not select Plaintiffs for promotion because of their poor survey results. He testified that the scores demonstrated that those who were familiar with Plaintiffs' qualifications did not believe they would be as "successful" or "ready" for promotion in comparison to the other candidates. Serpas averred that he did not take race or gender into consideration **[\*\*44]** when deciding whom to promote. Thus, Defendants have provided a permissible, non-discriminatory basis for the adverse employment decision, and Plaintiffs bear the burden of producing a triable issue of fact that the basis was a pretext for reverse discrimination.

We have explained that *HN14*[⬆] a closer comparison of candidates is appropriate when the parties dispute whether an employee was **[\*539]** chosen for promotion based on qualifications versus discriminatory animus. *Provenzano, 663 F.3d at 816*. In conducting our evaluation, we do not act as a "'super personnel department,' overseeing and second guessing employers' business decisions," *Bender v. Hecht's Dep't Stores, 455 F.3d 612, 626 (6th Cir. 2006)*, but rather simply compare characteristics such as "[d]ifferences in job title, responsibilities, experience, and work record," in order to make an informed determination about whether an employment decision was based on pretext, *Leadbetter, 385 F.3d at 691*.

As noted above, however, Plaintiffs have provided the Court with none of the information required to draw an informed comparison. Rather, the only pertinent information we have before us shows that both minority and majority candidates with better **[\*\*45]** survey scores were promoted ahead of Plaintiffs. Likewise, candidates with lower survey scores of both races and genders were not selected for promotion. These facts render fatal Plaintiffs' claims of pretext.

Finally, we note that the move to the new promotions procedure was apparently based on a variety of factors. Plaintiffs concede that the test-based promotions method was criticized for a number reasons—one of which was the disadvantage it imposed on minority candidates—but also for other reasons that were not based on race or gender. The MNPD, its officers, and the consulting company that worked on the updated procedure all agreed that the old method did not take into account other factors that critically affected the candidate's suitability for promotion—including length of service, educational background and training, and the opinions of the candidates' supervisors. The fact that the survey instructions mentioned these permissible factors, and not those impermissible factors of race or gender, also undermines Plaintiffs' claims for pretext.

### D. Disparate Impact Claims

We turn next to Plaintiffs' claims of disparate impact brought under Title VII. *HN15*[⬆] "Disparate impact causes of action **[\*\*46]** penalize employment practices that are 'fair in form but discriminatory in operation.'" *Phillips v. Cohen, 400 F.3d 388, 397 (6th Cir. 2005)* (quoting *Griggs, 401 U.S. at 431*). "Thus, disparate impact analysis is intended to make sure that employers do not use 'neutral' decision-making mechanisms that in fact work to eliminate a greater portion of otherwise-qualified protected group members than they do members of other groups." *Id.* Accordingly, a disparate impact claim does not require a showing of intent to discriminate. *Id.* Instead, the plaintiff must allege that a specific employment practice had an adverse effect on a group of employees, despite its facial neutrality. *Id.*

Disparate impact analysis requires the Plaintiff to identify—with specificity—the particular procedure having an adverse effect. *Dunlap v. TVA, 519 F.3d 626, 629 (6th Cir. 2008)*. A three-part burden-shifting test is

then used to examine a disparate impact claim: (1) the plaintiff must establish a *prima facie* case for discrimination; (2) the employer may then show that the challenged procedure is justified by "business necessity"; and (3) the plaintiff can rebut the employer's justification by showing that other **[\*\*47]** tests or selection protocols would serve the employer's interest without creating the undesirable discriminatory effect. *Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975)*.

### 1. Procedural Posture

Before turning to the merits of Plaintiffs' disparate impact claim, we must consider **[\*540]** its procedural posture and Plaintiffs' argument that the district court improperly denied them leave to amend in order to supplement their disparate impact arguments.

In the instant case, there are three components of the new promotions procedure that Plaintiffs could have alleged caused a disparate impact: (1) the change from the test-based promotions procedure to the eligibility roster procedure; (2) Serpas' unilateral discretion to select candidates for promotion off the roster based on unspecified criteria; and (3) the introduction of the supervisors' subjective opinions by way of the survey results. Of these, and as further explained below, Plaintiffs only alleged the first of the three had a disparate impact.

At the close of discovery, Plaintiffs moved to amend their complaint, in order to allege "all facts as known to the plaintiffs as of today with regard to these charges." The additional paragraphs **[\*\*48]** detailed information Plaintiffs learned during the discovery process, including additional details about how the survey process was implemented. However, the motion to amend did not seek to add any additional charges of disparate impact beyond Plaintiffs' original challenge to the eligibility roster procedure.

Accordingly, Plaintiffs never sought to add a claim that Serpas' discretion caused a disparate impact. Likewise, Plaintiffs never claimed that the supervisor surveys caused a disparate impact. Plaintiffs however, did allege that these aspects of the promotions procedure caused a disparate impact in their response to Defendants' motion to dismiss. Plaintiffs' arguments, however, went beyond the strict allegations raised in their proposed amended complaint—that the "sliding-band" procedure caused a disparate impact—and went on to say that "the Captain's surveys and the input from Serpas

caused a disparate impact on the promotions favoring minorities over white males."

The district court denied Plaintiffs' motion to amend, noting that the amendment deadline passed two months prior; that Plaintiffs had requested extensions on several other deadlines, but not on the amendment deadline; **[\*\*49]** and that Plaintiffs' filing violated *HN16*[⬆] *Federal Rule of Civil Procedure 16(b)(4)* (requiring good cause to modify a scheduling order) and *HN17*[⬆] Local Rule 7.01(a) (requiring the filing of an accompanying memorandum of law where a motion "may require the resolution of an issue of law"). Finally, the court commented that Plaintiffs had already amended their claims multiple times and that the latest reason given— "to allege all facts as known to the plaintiffs as of today with regard to these charges"—was "insufficient to justify a *fourth amendment*."

Shortly thereafter, the district court granted Defendants' motion to dismiss the disparate impact claim. The district court noted the pleading errors described above and commented that, while "plaintiffs [] somewhat convincingly argue[d]" a disparate impact claim related to the surveys, the argument could not be considered because Plaintiffs failed to raise it in their complaint. *See Johnson II, 2008 U.S. Dist. LEXIS 59663, 2008 WL 3163531, at \*6* (citing *Kostrzewa v. City of Troy, 247 F.3d 633, 643 (6th Cir. 2001))*.

### 2. Denial of Leave to Amend

*HN18*[⬆] *Rule 15(a)(2) of the Federal Rules of Civil Procedure* provides that a court may freely grant leave to amend a pleading when justice so requires, **[\*\*50]** in order to make certain that a case is tried on its merits "rather than [on] the technicalities of the pleadings." *Moore v. City of Paducah, 790 F.2d 557, 559 (6th Cir. 1986)*. "In deciding whether to grant a motion to amend, courts should consider undue delay in filing, lack of notice to the opposing **[\*541]** party, and futility of amendment." *Brumbalough v. Camelot Care Ctrs., Inc., 427 F.3d 996, 1001 (6th Cir. 2005)*. Unless leave was denied on the basis of futility, this Court reviews the district court's decision for abuse of discretion. *Ziegler v. Aukerman, 512 F.3d 777, 786 (6th Cir. 2008)*.

*Rule 15* provides that leave to amend "shall be freely given when justice so requires." *Fed. R. Civ. P. 15(a)*. In the absence of reasons such as those listed above, leave should generally be granted. *Forman v. Davis, 371 U.S. 178, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)*.

Nevertheless, a district court retains its discretion on such matters, and provided that the court announces a clear reason for its decision, this Court will generally defer to its reasoning. *Id.*

HN19[↑] *Rule 15* is augmented by *Rule 16*, which states that the generally wide latitude to amend may be restricted by the court's other scheduling orders. *See Fed. R. Civ. P. 16(b)*. *Rule 16* **[\*\*51]** requires that a party seeking to amend outside a scheduling order may do so only on a showing of "good cause." This limitation is "designed to ensure that 'at some point both the parties and the pleadings will be fixed.'" *Leary, 349 F.3d at 906*. In balancing *Rules 15* and *16*, this Court considers the movant's "diligence in attempting to meet the case management order's deadlines" and "whether the opposing party will suffer prejudice by virtue of the amendment." *Id.*

Plaintiffs contend that the district court abused its discretion when it refused to grant their motion to amend. They contend that the district court unfairly denied the motion solely on procedural technicalities and that, by doing so, it denied them the opportunity to allege facts that "could not have been discovered [] without having conducted written discovery." Given that the district court perceived some merit in a disparate impact claim based on the surveys, Plaintiffs contend the court's refusal to allow amendment was in error.

We disagree. Plaintiffs have made no real attempt, either before the district court or before us now, to argue that "good cause" supported an amendment sought over two months after the deadline **[\*\*52]** in the court's scheduling orders. Plaintiffs simply perfunctorily allege that they could not have discovered the facts required to support their claims before written discovery was conducted. However, Plaintiffs never state with any specificity when the evidence was received or why they could not have met or sought an extension on the district court's original deadline.

We note that the disparate impact claims Plaintiffs now put forth are largely based on information that Plaintiffs appear to have known from the outset of this suit. For instance, as Plaintiffs' own affidavits indicate, they knew that Serpas had total discretion to select candidates for promotions off the eligibility roster, and they knew, or at least discovered shortly after the disputed promotions were announced, that an anonymous supervisor survey had been conducted. Accordingly, Plaintiffs had access to the basic facts required to allege their new disparate impact claims, even if they lacked certain specifics.

Moreover, even if we were to consider the new evidence Plaintiffs sought to add by way of an amended complaint, the fact remains that Plaintiffs failed to expand the legal bases for their disparate impact claims. **[\*\*53]** A close reading of the documents reveals that the district court was correct. Plaintiffs only properly alleged a disparate impact claim based on the eligibility roster method. Although Plaintiffs' response to the motion to dismiss expanded their disparate impact claims, the district court was limited, as are we, to the facts and legal claims as raised in the pleadings. *See* **[\*542]** *Moore's Federal Practice § 12.34*. (HN20[↑]) "The court may not . . . take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under *Rule 7(a)*."). Accordingly, the district court did not abuse its discretion in denying Plaintiffs leave to amend.

### 3. Merits Analysis

Thus, we are left only to consider the disparate impact claim that was properly before the court—whether the move to the eligibility roster imposed a disparate impact on non-minority, male candidates. The district court rejected the challenge, noting that the complaint "alleged that MNPD ignored the objective criteria it gathered from the written examination and the assessment *because of an intent to discriminate*." *Johnson II, 2008 U.S. Dist. LEXIS 59663, 2008 WL 3163531, at \*6* (emphasis added). The district **[\*\*54]** court reasoned that this type of allegation was more akin to a disparate treatment claim than it was to a disparate impact claim. *Id.* We agree.

Finally, we briefly point out *Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009)*, a case issued by the Supreme Court about a year after the district court dismissed Plaintiffs' disparate impact claim. In *Ricci,* the Supreme Court found that the city of New Haven, Connecticut imposed a disparate impact on certain Caucasian firefighters when it refused to certify examination results used for making promotions when the results failed to produce any minority candidates. The fact that the City changed its procedures during the middle of the promotions process was a key factor in the Supreme Court's decision:

> [Once a promotion process is established] and employers make clear their selection criteria, they may not then invalidate the test results, thus upsetting an employee's legitimate expectation not

to be judged on the basis of race. Doing so, absent a strong basis in evidence of an impermissible disparate impact, amounts to the sort of racial preference that Congress disclaims, and is antithetical to the notice of a workplace where individuals are guaranteed **[\*\*55]** equal opportunity regardless of race.

*Id. at 585*.

To be sure, guidance from *Ricci* might have helped Plaintiffs plead their allegations with requisite specificity, had that case been available to them. However, the present case remains easily distinguishable from *Ricci*, in that there is no evidence to show that Defendants disregarded any valid scores. And while Plaintiffs might have argued that their legitimate expectations were upset by the delayed introduction of the supervisor surveys, as explained above, they failed to properly allege this argument in their complaint. [6] Accordingly, we affirm the district court's decision dismissing Plaintiffs' disparate impact claim.

### III. Tennessee Human Rights Act

Citing *Gossett v. Tractor Supply Co., 320 S.W.3d 777, 779 (Tenn. 2010)*, Plaintiffs next argue that the  **[\*\*56]** district court applied an incorrect summary judgment standard to their claims brought under the THRA. In *Gossett*, the Tennessee Supreme Court reasoned that it was inappropriate to use the *McDonnell Douglas* framework to decide summary judgment motions for claims brought under the THRA, inasmuch as the **[\*543]** *McDonnell Douglas* framework was incompatible with Tennessee's own summary judgment jurisprudence. However, shortly thereafter, the Tennessee legislature abrogated *Gossett* by statute. *See Tenn. Code Ann. § 4-21-311(e)*; *see also Bobo v. UPS, 665 F.3d 741, 757 (6th Cir. 2012)*. Plaintiffs' argument on this point is therefore moot.

### IV. Costs

---

[6] There remains an outstanding factual dispute as to when the supervisor surveys were introduced into the promotions process. Plaintiffs allege that the surveys were introduced during a delay that followed the announcement of the eligibility rosters; Serpas testified in his deposition, however, that he made the decision to conduct the surveys when the new promotions procedure was announced.

The district court awarded Metro the costs of defending both Serpas and Metro against this lawsuit. On appeal, Plaintiffs raise two challenges to this decision. First, Plaintiffs argue that, regardless of the fact that Metro actually paid for Serpas' costs and legal fees, Serpas should have filed a separate bill of costs. Second, they argue that the district court did not carefully scrutinize whether the cost of a second set of transcripts for Serpas' attorneys was truly "necessary."

*HN21*[↑] This Court reviews a district court's award of attorneys costs for abuse **[\*\*57]** of discretion. *Singleton v. Smith, 241 F.3d 534, 538 (6th Cir. 2001)*. Awards decisions are "fact-intensive" and a trial court's determination of those facts is entitled to substantial deference. *See Imwalle v. Reliance Med. Prods., 515 F.3d 531, 551 (6th Cir. 2008)*. Applying this standard, neither of Plaintiffs' arguments have merit.

*HN22*[↑] *Federal Rule of Civil Procedure 54(d)(1)* provides that "costs other than attorney's fees [] should be allowed to the prevailing party." The presumption in favor of awarding costs may only be reversed upon a "heavy showing" that the court abused its discretion. *Baji v. N.E. Reg'l Bd. of Dental Examiners, Inc., 3 F. App'x 352, 360 (6th Cir. 2001)* (citing *White & White, Inc. v. Am. Hosp. Supply Corp., 786 F.2d 728, 730 (6th Cir. 1986))*. In order to award costs to a prevailing party, the court must determine that:

> the expenses are allowable cost items and that the amounts are reasonable and necessary. As long as statutory authority exists for a particular item to be taxed as a cost, [the court] shall not overturn a district court's determination that the cost is reasonable and necessary, absent a clear abuse of discretion. Thus, we shall review carefully whether  **[\*\*58]** an expense is recoverable, but once we determine that it is, we defer to the district court, which is in the best position to determine whether the cost is recoverable.

*Baker v. First Tenn. Bank Nat'l Assoc., 142 F.3d 431 (6th Cir. 1998)* (table) (citing *Northbrook Excess & Surplus Ins. Co. v. Proctor & Gamble Co., 924 F.2d 633, 642 (7th Cir. 1991))*.

*HN23*[↑] *Rule 54(d)* provides that costs "should be allowed to the prevailing party," but it does not specify how to file a bill of costs. The Middle District of Tennessee's Local Rule 54.01 is somewhat more specific and requires that "a cost bill, with supporting documentation, shall be *filed by the prevailing party*."

(emphasis added). However, this rule does not provide that each prevailing party must file separately, and we have found no cases requiring that. Lastly, we note that Plaintiffs did not cite to Local Rule 54.01 before the district court. Accordingly, the district court did not abuse its discretion.

Plaintiffs next argue that the second set of transcripts was not reasonable or necessary, and they fault the district court for failing to carefully scrutinize whether Serpas' attorneys had an individual need for the transcripts. This claim **[\*\*59]** is meritless. The depositions in question—those of Chief Serpas, Deputy Chiefs Pike and Anderson, and Eric Cardinal—were at the core of Plaintiffs' claims of reverse discrimination against Serpas and critical to his defense against those charges. Accordingly, **[\*544]** the deposition transcripts were necessary and the award of costs was appropriate.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's judgment in all respects.

---

**End of Document**

Last updated  April 14, 2026   03:13:52 pm GMT

# *Gaffney v. Potter*

United States Court of Appeals for the Sixth Circuit

September 30, 2009, Filed

File Name: 09a0668n.06

No. 08-3799

## Reporter

345 Fed. Appx. 991 *; 2009 U.S. App. LEXIS 21802 **; 2009 FED App. 0668N (6th Cir.)

THOMAS M. GAFFNEY, Plaintiff-Appellant, v. JOHN E. POTTER, POSTMASTER GENERAL, U.S. POSTAL SERVICE, Defendant-Appellee.

**Notice:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**Prior History: [**1]** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO.

*Gaffney v. Potter, 2007 U.S. Dist. LEXIS 85259 (N.D. Ohio, Nov. 19, 2007)*

## Core Terms

ratings, terminated, grant of summary judgment, probationary employee, probationary period, race discrimination, age discrimination, summary judgment, district court, material fact, matter of law, mail carrier, years old, unsatisfactory, probationary, training, genuine, lasted, fired, hired

**Counsel:** For THOMAS M. GAFFNEY, Plaintiff - Appellant: Robert Samuel Bauders, Law Office, Cleveland, OH.

For JOHN E. POTTER, Postmaster General, Defendant - Appellee: Ray Donahue, U.S. Postal Service, Law Department, Civil Practice, Washington, DC; William J. Kopp, Assistant U.S. Attorney, U.S. Attorney's Office, Cleveland, OH.

**Judges:** Before: MARTIN, COLE, and KETHLEDGE, Circuit Judges.

**Opinion by:** KETHLEDGE

## Opinion

 **[*992]  KETHLEDGE, Circuit Judge.** Thomas Gaffney appeals the district court's grant of summary judgment in favor of the United States Postal Service (USPS) on Gaffney's claims of age and race discrimination. We affirm.

I.

USPS hired Gaffney as a mail carrier on a probationary basis on October 16, 2004. Gaffney is white, and was then 58 years old. USPS's agreement with the National Association of Letter Carriers gives it the right to "separate from its employ any probationary employee at any time" during the employee's 90-day probationary period.

On November 15, 2004, approximately 30 days into his employment, Gaffney was rated "unsatisfactory" for his work quantity, quality, dependability, and personal conduct. USPS gave Gaffney additional **[**2]** training after the review, hoping to improve his performance. But USPS says, and Gaffney does not seriously dispute, that it did not improve; and on December 2, 2004, Gaffney was terminated for "failure to accomplish tasks in a timely manner." He had then worked at USPS for 47 days.

Anthony Gibson, who is African-American, overlapped with Gaffney at USPS. Gibson was 43 years old then. He too was hired as a mail carrier on a probationary basis, on October 30, 2004. Like Gaffney, Gibson received an evaluation after his first 30 days of

Katherine Baron

employment, but Gibson was rated as unsatisfactory in only three areas rather than four. Like Gaffney, Gibson received some extra training; but his performance ratings likewise did not improve, and he too was terminated, on January 22, 2005, after having worked at USPS for 84 days.

Gaffney thereafter filed this lawsuit, alleging that he was fired due to race discrimination, in violation of Title VII, *42 U.S.C. § 2000e-16(a)*, and age discrimination, in violation of the Age Discrimination in Employment Act (ADEA), *29 U.S.C. § 633a(a)*. USPS moved for summary judgment on both claims, which the district court granted. This appeal followed.

II.

We review *de novo* **[**3]** a district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party. *Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009)*. **[*993]** Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*.

There are many problems with Gaffney's case, but we need focus on only one of them to dispose of his appeal. A common element of Gaffney's race- and age-discrimination claims is that a similarly-situated employee "was treated better" than he was. *Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992)*. The employee to whom Gaffney points is Gibson, an ironic choice given that he too was fired during his probationary period; but Gaffney complains that Gibson lasted 37 days longer than he did in the position. And that difference, Gaffney says, was on account of Gaffney's race and age.

The district court correctly held that these claims do not present a genuine issue of material fact. As a initial matter, Gaffney's assertion that the difference **[**4]** between his treatment and Gibson's was "significant" enough to power up the machinery of federal anti-discrimination law seems to us very dubious. *See Burlington Indus. v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1988)*. That one probationary employee lasted a few weeks longer than another, when both were eventually terminated, is not the stuff of a compelling discrimination claim. And that nearly *de minimis* difference does not support a claim at all, as a matter of law, when Gibson received somewhat better ratings than Gaffney did. The

difference in ratings is roughly commensurate with the difference in treatment. Gibson therefore was not similarly situated to Gaffney for purposes of the latter's claims; and that means the claims fail.

The district court's judgment is affirmed.

---

**End of Document**

 Last updated  April 14, 2026   03:13:01 pm GMT

# *Evans v. Toys R Us Ohio, Inc.*

United States Court of Appeals for the Sixth Circuit

June 2, 2000, Filed

No. 99-3233

**Reporter**

2000 U.S. App. LEXIS 14076 *

DAVID B. EVANS, Plaintiff-Appellant, v. TOYS R US OHIO, INC. and TOYS R US DELAWARE, INC., Defendants-Appellees.

**Notice: [*1]** CONSULT 6TH CIR. R. 32.1 FOR CITATION OF UNPUBLISHED OPINIONS AND DECISIONS.

**Subsequent History:** Reported in Table Case Format at: *2000 U.S. App. LEXIS 24141*.

**Prior History:** On Appeal from the United States District Court for the Northern District of Ohio. 98-01305. Gwin. 1-15-99.

**Disposition:** AFFIRMED.

# Core Terms

similarly situated, summary judgment, race discrimination, prima facie case, district court, statute of limitations, continuing violation, limitations period, discriminatory, performance review, non-minority, doctrine, store manager, region, protected class, public policy, retaliate, federal court, chapel, skill, toy

# Case Summary

### Procedural Posture

Plaintiff appealed summary judgment from the United States District Court for the Northern District of Ohio dismissing his claims for failure to promote based on his race in violation of the Ohio Revised Code, *42 U.S.C.S. §§ 1981* and *1981a*, and Ohio public policy.

### Overview

Plaintiff manager challenged the summary judgment granted to defendant retail store on his claims for failure

to promote based on his race in violation of *42 U.S.C.S. §§ 1981* and *1981a* and Ohio public policy. The court affirmed. First, the court agreed that the discriminatory conduct occurring more than two years before the filing of the complaint was barred by the statute of limitations, and the continuing violation doctrine was inapplicable. Plaintiff failed to establish a prima facie case of race discrimination. Because plaintiff could not show that he was passed over for promotion in favor of a non-minority employee who was similarly situated in all relevant respects, he failed to meet his burden of proof under McDonnell Douglas. Because Ohio courts did not recognize policy claims for failure to promote, the district court properly found that plaintiff's claims were not actionable under Ohio law.

### Outcome

Judgment affirmed because conduct arising more than two years before filing complaint was time-barred, plaintiff failed to show that he was passed over in favor of non-minority employee who was similarly situated in all relevant respects, and failure to promote claim was not actionable under Ohio public policy.

# LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Appellate Review > General Overview

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of

Review

### *HN1*[⬇]  Standards of Review, De Novo Review

A district court's decision to grant summary judgment and to dismiss without prejudice plaintiff's claims of retaliation are reviewed de novo.

> Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

> Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

### *HN2*[⬇]  Summary Judgment, Evidentiary Considerations

In determining whether to grant a party's motion for summary judgment, the district court must view the evidence and draw all reasonable inferences in favor of the non-moving party. Although merely alleging a factual dispute is insufficient to defeat summary judgment, the district court may not dispose of the case in favor of the movant if there is sufficient evidence on which a jury could reasonably find for the plaintiff.

> Business & Corporate Compliance > Labor & Employment > Discrimination
> Labor & Employment Law > Discrimination

> Civil Procedure > ... > Affirmative Defenses > Statute of Limitations > Borrowing Statutes

> Governments > Legislation > Statute of Limitations > General Overview

> Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Erie Doctrine

> Civil Rights Law > ... > Contractual Relations &

Housing > Property Rights (sec. 1982) > General Overview

### *HN3*[⬇]  Labor & Employment, Discrimination

Because *42 U.S.C.S. § 1981*, like *42 U.S.C.S. §§ 1982* and *1983*, does not contain a statute of limitations, federal courts should select the most appropriate or analogous state statute of limitations.

> Business & Corporate Compliance > Labor & Employment > Discrimination
> Labor & Employment Law > Discrimination

> Civil Procedure > ... > Affirmative Defenses > Statute of Limitations > Borrowing Statutes

> Governments > Legislation > Statute of Limitations > Time Limitations

> Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Erie Doctrine

> Civil Rights Law > ... > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination

> Governments > Legislation > Statute of Limitations > General Overview

> Labor & Employment Law > Discrimination > Racial Discrimination > Statute of Limitations

### *HN4*[⬇]  Labor & Employment, Discrimination

The fact that *42 U.S.C.S. § 1983* claims are in essence claims for personal injury so the state statute applicable to such claims should be borrowed applies with equal force to claims arising under *42 U.S.C.S. § 1981*. Thus, claims arising under *§ 1981* are governed by the residual limitations period that applies to personal injury suits filed in the forum state if the law of the relevant state does not provide a statute of limitations specific to the claims presented.

> Governments > Legislation > Effect & Operation > Prospective Operation

> Governments > Legislation > Effect &

Operation > Retrospective Operation

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

### *HN5*[⤓] **Effect & Operation, Prospective Operation**

Under Ohio decisions, retroactivity is determined with respect to the time at which the action was filed, not with respect to the time at which the underlying offenses occurred.

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Effect & Operation > Prospective Operation

### *HN6*[⤓] **Legislation, Statute of Limitations**

Under Ohio law, statutes of limitations are remedial and procedural in nature.

Business & Corporate Compliance > Labor & Employment > Discrimination
Labor & Employment Law > Discrimination

Governments > Legislation > Statute of Limitations > Time Limitations

Governments > Legislation > Statute of Limitations > General Overview

### *HN7*[⤓] **Labor & Employment, Discrimination**

The doctrine of continuing violations is a judicially-created one which has been used in two ways: It may provide the court with "jurisdiction" over a cause of action which was filed after the limitations period had run on a discrete discriminatory act triggering the statute. The doctrine also may allow a court to impose liability on an employer for acts committed outside the limitations period if the employee is able to prove the continuing nature of the challenged activity.

Governments > Legislation > Statute of

Limitations > Extensions & Revivals

Labor & Employment
Law > Discrimination > Actionable Discrimination

Governments > Legislation > Statute of Limitations > General Overview

Business & Corporate Compliance > Labor & Employment > Discrimination
Labor & Employment Law > Discrimination

Labor & Employment Law > ... > Civil Actions > Time Limitations > Continuing Violations

### *HN8*[⤓] **Statute of Limitations, Extensions & Revivals**

To invoke the continuing violation exception to the limitations period, the moving party must show more than a single isolated incident of harm or otherwise demonstrate some "overarching policy of discrimination" that might constitute a "continuing violation." Specifically, the moving party must show either a long-standing and demonstrable policy of discrimination, such as an established and repeated pattern of paying men more than women, or some evidence of present discriminatory activity giving rise to a claim of a continuing violation, i.e. where an employer continues to presently impose disparate work assignment or pay rates between similarly situated employee groups.

Business & Corporate Compliance > Labor & Employment > Discrimination
Labor & Employment Law > Discrimination

Civil Rights Law > ... > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination

Evidence > Inferences & Presumptions > General Overview

### *HN9*[⤓] **Labor & Employment, Discrimination**

Claims arising under both *42 U.S.C.S. § 1981* and Title VII, *42 U.S.C.S. § 2000e et seq.*, carry the same standards of proof.

Business & Corporate Compliance > Labor &

Employment > Discrimination
Labor & Employment Law > Discrimination

Civil Rights Law > ... > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination

Evidence > Inferences & Presumptions > General Overview

Civil Rights Law > ... > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Protected Classes

Civil Rights Law > ... > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Public Discrimination

### *HN10*[⬇] **Labor & Employment, Discrimination**

The federal courts utilize the McDonnell Douglas burden-shifting framework to analyze claims of race discrimination arising under Title VII, *42 U.S.C.S. § 2000e et seq.*, and *42 U.S.C.S. § 1981* as well as under state anti-discrimination laws.

Evidence > Inferences & Presumptions > General Overview

### *HN11*[⬇] **Evidence, Inferences & Presumptions**

Direct evidence is evidence that, if believed, proves the existence of discrimination without inference or presumption.

Evidence > Inferences & Presumptions > General Overview

Labor & Employment Law > Discrimination > Racial Discrimination > General Overview

### *HN12*[⬇] **Evidence, Inferences & Presumptions**

To establish a prima facie case of race discrimination in a failure to promote case, the plaintiff must present evidence sufficient to convince a reasonable jury that: (1) he was qualified for the promotion at issue; (2) he is a member of a protected class; (3) he was considered for and denied the position in question; and (4) he was rejected in favor of another person with similar qualifications who was not a member of the protected class.

Business & Corporate Compliance > Labor & Employment > Discrimination
Labor & Employment Law > Discrimination

Evidence > Inferences & Presumptions > General Overview

### *HN13*[⬇] **Labor & Employment, Discrimination**

Once the plaintiff establishes a prima facie case, the defendant may rebut the presumption of illegal discrimination by articulating a legitimate, non-discriminatory reason for the challenged conduct. If the defendant is able to justify its conduct, the burden shifts back to the plaintiff to prove that the proffered explanation is pretextual. In evaluating whether the plaintiff has met his burden, it is not enough to "dis" believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.

Evidence > Inferences & Presumptions > General Overview

Labor & Employment Law > Discrimination > Racial Discrimination > General Overview

### *HN14*[⬇] **Evidence, Inferences & Presumptions**

The "similarly situated" element of the prima facie case is as follows: It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly situated in all respects. Thus, to be deemed similarly situated, the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have been engaged in the same conduct.

Evidence > Inferences & Presumptions > General Overview

Labor & Employment Law > Discrimination > Racial Discrimination > General Overview

### *HN15*[⬇] **Evidence, Inferences & Presumptions**

The plaintiff is required to prove that all of the relevant aspects of his employment situation were "nearly identical" to those of the non-minorities' employment situations in meeting the "similarly situated" element of the prima facie case.

Evidence > Inferences & Presumptions > General Overview

Labor & Employment Law > Discrimination > Racial Discrimination > General Overview

**HN16**[⬇]  **Evidence, Inferences & Presumptions**

If a plaintiff cannot show that he was passed over for promotion in favor of a non-minority employee who was similarly situated in all relevant respects, he cannot meet his burden of proof under McDonnell Douglas.

**Counsel:** For DAVID B. EVANS, Plaintiff - Appellant: Laura M. Sullivan, Richard C. Haber, Reminger & Reminger, Cleveland, OH.

For TOY'S R US-OHIO, INC., TOY'S R US-DELAWARE, INC., Defendants - Appellees: James R. Williams, Jackson, Lewis, Schnitzler & Krupman, New York, NY.

For TOY'S R US-OHIO, INC., TOY'S R US-DELAWARE, INC., Defendants - Appellees: Stephen S. Zashin, Zashin & Rich, Cleveland, OH.

For TOY'S R US-OHIO, INC., Defendant - Appellee: Mindy S. Novick, Jackson, Lewis, Schnitzler & Krupman, New York, NY.

**Judges:** Before: BOGGS and COLE, Circuit Judges, and ZATKOFF, District Judge. [*] R. GUY COLE, JR., Circuit Judge, Concurring in Result. **[*2]**

# Opinion

**PER CURIAM.** Appellant David Evans is an African-American male currently on leave from his employment with the defendants ("Toys R Us" or "TRU" collectively) as a store manager in TRU's Chapel Hills/Cuyahoga Falls store near Akron, Ohio. On appeal, Evans contests

---

[*] The Honorable Lawrence P. Zatkoff, Chief United States District Judge for the Eastern District of Michigan, sitting by designation.

the district court's grant of summary judgment for the defendants on Evans's claims that the defendants' failure to promote him constituted race discrimination in violation of the Ohio Revised Code, *42 U.S.C. §§ 1981* and *1981a*, and Ohio public policy. [1] We affirm the judgment of the district court.

**I**

Evans began his career with TRU in 1986, when he was hired to work part-time as a storeroom clerk whose principal duties included assembling merchandise and **[*3]** unloading trucks. In 1988, he was promoted to the position of Department Head and became responsible for shipping and receiving at the Rolling Acres store in Ohio. In 1990, based upon his performance as a Department Head and the recommendation of his direct supervisor, Evans was accepted into TRU's management training program.

After graduating from the program in 1990, Evans was promoted to Store Manager [2] at the TRU store in Canton, Ohio. Two years later, in 1992, he was transferred back to the Rolling Acres store in the capacity of Front End Manager, a lateral move within the company. At the end of 1993, he was against transferred, this time to the Chapel Hill store, where he became the 500's Manager. [3] Throughout his employment with TRU, Evans received performance reviews from his supervisors on either a semi-annual or annual basis. In performance reviews issued from the time he began his career to the time he was promoted to store manager, Evans's performance reviews indicate that his overall job performance "met expectations" and that in certain categories his performance exceeded company expectations. For example, an evaluation dated February 7, 1989, states that, although **[*4]** Evans's overall performance as a Department Head "met expectations," his performance in certain categories, notably leadership ability, exceeded the

---

[1] The district court granted Evans's motion to dismiss without prejudice his claims that the defendants retaliated against him in violation of both Ohio law and *42 U.S.C. § 1981a* and the defendants do not cross-appeal on this issue.

[2] Store Manager is the third level of supervision in a TRU store. Store Managers (as many as four) report to Assistant Store Directors, who in turn report to Store Directors.

[3] The "500's Manager" is the manager in charge of merchandise designated with a 500 (as opposed to 100, 200, or other) number series for shelving and inventory purposes within a TRU store.

company's expectations. Similarly, an evaluation issued shortly after he was promoted to Store Manager in December 1990 states that "David has gone from a driven, self-motivated trainee . . . [to] a driven, self-motivated manager."

In April 1994, Linda Channels, the Store Director of the Chapel Hills location, reviewed Evans's performance as a store manager. According to Channels, Evans had performed very well, and she opined that he would be eligible for promotion to the position of Assistant Store **[*5]** Director in one or two years. Beginning in 1995, however, Evans's performance evaluations changed. Although his performance was still listed as meeting expectations, his growth potential (as indicated by a rating in his performance evaluations) was downgraded to "correctly placed in position." The evaluation Evans received in April 1995 was the first evaluation that placed limits on his potential for promotion, and he contends that, although his direct supervisor, Chris Elias, felt he deserved a better evaluation, then-District Manager David Peachey instructed Elias to temper the review, so Elias signed and submitted a revised version of his original evaluation.

Evans contends that his situation became worse when, in 1996, a new Assistant Director, Debbie Walsh, became his supervisor at the Chapel Hills store. Although Evans's February 1996 evaluation stated that his overall performance "met expectations," Walsh noted that his performance in certain areas (which had previously been rated as "exceeds expectations") was now rated as "below expectation." Specifically, Walsh gave Evans a rating of "below expectation" for Supervisory Skills and Planning/Organizational Skills. She also **[*6]** suggested that he be assigned to the position of "Salesfloor Manager" to facilitate his professional development in these areas.

Approximately six months later, on November 15, 1996, Walsh performed Evans's mid-year performance review, in which she again rated his overall performance as meeting expectations. In the review, however, Walsh observed that Evans had difficulty adjusting to the position of Salesfloor Manager and stated that, as a result, he had been reassigned to the position of Front-End Manager "where he is proving to be effective." With regard to his performance as Salesfloor Manager, Walsh specifically observed that:

> Dave needs to continue to learn and apply new procedures as they become available; make extra efforts to learn procedures that are not Front-End related. Dave must make FOCUS issues a daily priority -- shelf labels, top 100, bad maintenance issues must be followed up on . . . .

Plaintiff's Exh. 15, TRU Mid-Year Review of Evans's Performance from 2/96 - 9/96 by Ass't Store Director Debbie Walsh, at JA 514. With regard to Evans's overall performance, Walsh stated:

> Dave needs to continue developing his knowledge of the salesfloor -- **[*7]** this has seriously affected his ability to be a successful manager this year.
>
> . . . .
>
> Dave has trouble meeting salesfloor deadlines. Had difficulty learning and implementing aisle work list. Over delegates task or delegates without proper follow up resulting in tasks not being completed or redone . . . .

*Id.* at JA 513.

Shortly after receiving his November review, Evans wrote a letter to TRU's Human Resource Manager, Linda Klugh, complaining about the manner in which Walsh treated him and the manner in which she characterized his performance in the November 1996 evaluation. Specifically, Evans stated in his letter that Walsh had been "very hostile in her treatment of [him] and [would] not listen or show any respect for [his] opinions regarding operations that could benefit the company." He also stated that:

> In the recent past I have been contacted by Toys R Us employees about the treatment that Ms. Walsh has bestowed upon me. They have indicated to me that Ms. Walsh has disdain against minorities and men in particular.

Plaintiff's Exh. 12, Letter from David Evans to Linda Klugh, dated 11/16/96, at JA 496.

In his briefs both before the district **[*8]** court and on appeal, Evans claims that Klugh failed to investigate, or take action to remedy, Walsh's discriminatory behavior. In her deposition, Klugh described her actions in response to Evans's complaint as follows:

> Q. Do you maintain notes of the results of any investigations that you do in [response] [response to] complaints by employees?
>
> A. If they're like a sexual harassment complaint where there's an official investigation done, I keep those.

Q. How about racial harassment?

A. Well, I'd have to say no. David's is the only one I even looked into, and there was really nothing to investigate other than my documented letters back to David regarding my findings, or the counseling in Debbie's case. And I know that on at least one occasion I met with David and David Peachey, and on one occasion with David and Bob Bouzard to review findings of his complaints, and to get involved in how he could help manage the situation.

Q. So there were no notes kept of your investigation into David's complaints?

A. There was nothing to investigate. I mean, his complaints, any specific facts he gave me had nothing to do with racial motivation. His complaints about **[*9]** Debbie were concerns that other people in the store had as well. So I looked into it as a management issue, not a racial issue.

Q. Well, didn't David tell you that other store employees had told him that Debbie Walsh was a racist and didn't like blacks?

A. I don't recall him saying that.

Q. Had he told you that, would you have looked into that by interviewing other store employees?

A. Of course.

Q. If any employee gave you specific details as to comments that have been made to him about perceived racial discrimination, would it be your responsibility to investigate it or would you delegate that?

A. In most cases, I would investigate it.
Plaintiff's Exh. 29, Klugh Deposition Testimony, at JA 696-97.

Despite Klugh's conclusion that Walsh's treatment of him was not motivated by race, Evans contends that TRU knew Walsh disliked minorities and men and knew that Walsh singled him out for poor treatment because he was a minority. In support of these contentions, Evans introduced into evidence a Counseling Review report (referenced in Klugh's testimony supra) reprimanding Walsh for her conduct toward him. The report detailed the reasons for Walsh's counseling **[*10]** as follows:

Continued issues of poor management practices

after verbal discussion on 7/11/97 and statements on previous evaluations. These are specifically related to David Evans. The specific issues are speaking to subordinates regarding Dave, i.e. in the counting room (I'll have to figure out what to do with Dave) & in service area (Dave had better get that phone) as well as set ups -- mentioning to an employee that "you wait and see if Dave noticed an overage of Geoffrey money in the safe."
Plaintiff's Exh. 13, Counseling Review Report on Debbie Walsh, at JA 499. On October 20, 1996, HR Manager Klugh sent an email to then-District Manager Steve Poinsett regarding the situation. The email outlined the developments between Evans and Walsh, stating in pertinent part that:

I received [David Evans's] mid year review back today and attached was a 2 page letter that he carbon copied to his attorney. In this letter he makes some pretty strong accusations . . . . I also want to eliminate the line of thinking that he is being harassed because Debbie does not like minorities or men and that this is the result of his car accident. [4]

The largest concern I have **[*11]** is Debbie's mid year review. Some of the accusations that Dave has made in reference to his treatment are also outlined (verification) in Debbie's mid year review. This could put us in a sticky situation because we are documenting that Debbie does not treat the managers well. The only thing we will be able to focus on here is that Debbie treats everyone like that, not just minorities and men.
Plaintiff's Exh. 18, Klugh Email to TRU Management, at JA 521-22. Shortly after sending this email, Klugh sent a letter to another upper-level TRU employee discussing Evans's EEOC Complaint. In her letter, Klugh noted that Walsh's personal mid-year review "may hurt us since it backs up some of Dave's Complaints." JA 524.

**[*12]** Following his complaints concerning his 1996 evaluation, Evans's performance reviews were no longer conducted by Walsh even though she was still

---

[4] Evans was involved in a car accident that caused him to suffer mild back pain as a result of a disk problem. Although his doctor restricted him to light physical duty and Evans alluded in his EEOC complaint to TRU's failure to respect his physical limitations in assigning work, he does not contend in this suit that TRU has discriminated against him on the basis of his disability, or that his back pain has significantly interfered with his ability to function as a store manager.

his direct supervisor. Thus, in 1997, Evans was reviewed by the Chapel Hills Store Director, Bruce Clark. In his review, Clark evaluated Evans's performance as "meeting expectations" and rated his performance in certain areas, such as Leadership Skills and Communication Skills, as "clearly outstanding." However, like Evans's former supervisor Elias did in 1995, Clark rated Evans's growth potential as "correctly placed in present position." JA 793.

On October 23, 1998, Evans filed a formal written charge with the Ohio Civil Rights Commission/EEOC alleging that TRU discriminated against him on the basis of his race and his disability. Specifically, his OCRC/EEOC charge stated:

> I am [an] African American who has (Degenerative Disk) back problems. I have also been denied several promotions, the latest being on October 11, 1996, to an Assistant Store Director. I am now holding the job title of Manager.
>
> Debbie Walsh, Assistant Store Director, (Caucasian, Female), has not given me reason as to why I have not been promoted other than **[*13]** job performance.
>
> I believe I have been unlawfully discriminated against due to my race and disability for the following reasons:
>
> Since my employment with the company, I have worked out well on the job.
>
> My doctor has placed me on light duty, however occasionally I am asked to do things by my employer that my doctor has requested me not to do on the job.
>
> The company doesn't have a posting for promotions. The way I have been finding out about an employee being promoted is through the company news letters. No reason is ever given as to why I am not considered for a promotion to Assistant Store Manager.
>
> I feel I am being overlooked for promotions because of my race and disability.

Defendant's Exh. 19, Evans's OCRC/EEOC Charge, at JA 315.

On June 4, 1998, after receiving a right-to-sue letter from the EEOC, Evans filed suit against TRU in the district court, alleging that the company discriminated against him because of his race and retaliated against him for filing a complaint with the EEOC. TRU filed an Answer denying the substantive allegations set forth in the complaint, and, on August 14, 1998, filed an Amended Answer again denying the allegations. **[*14]** The matter was then referred to mediation, which did not conclude until October 5, 1998, when the parties moved jointly for an extension of the discovery deadline. On October 22, 1998, the court denied the motion for extension, and approximately one month later, on November 23, 1998, the defendants moved for summary judgment on all counts. Evans then moved to dismiss without prejudice, pending the completion of discovery, Counts III and IV of his complaint, in which he alleged that the defendants unlawfully retaliated against him for filing a discrimination charge with the EEOC. The defendants objected to Evans's motion to dismiss the retaliation claims without prejudice, so the district court ruled on both Evans's motion to dismiss and the defendants' motion for summary judgment in its January 14, 1999, order. After reviewing briefs from both parties, the district court granted the defendants' motion for summary judgment with respect to all of Evans's race discrimination claims, but dismissed Evans's retaliation claims without prejudice. Evans, who is still employed by TRU but is currently on disability leave due to depression, timely appealed the district court's grant of summary **[*15]** judgment to this court.

## II

### Standard of Review

*HN1*[↑] This court reviews de novo the district court's decision granting summary judgment to the defendants and dismissing without prejudice Evans's retaliation claims. *See Smith v. Ameritech, 129 F.3d 857, 863 (6th Cir. 1997)*; *Hartsel v. Keys, 87 F.3d 795, 799 (6th Cir. 1996)*, *cert. denied 519 U.S. 1055, 117 S. Ct. 683, 136 L. Ed. 2d 608 (1997)*. *HN2*[↑] In determining whether to grant a party's motion for summary judgment, the district court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*; *see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* (explaining that the district judge is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial"). Although merely alleging a factual dispute is insufficient to defeat summary judgment, the district court may not

dispose of the case in favor of **[\*16]** the movant if there is "sufficient evidence on which [a] jury could reasonably find for the plaintiff." *Anderson, 477 U.S. at 247-50*.

Retroactivity and Scope of the Ohio Statute of Limitations

It is well established that, "**HN3**[⬆] because *§ 1981*, like *§§ 1982* and *1983*, does not contain a statute of limitations, federal courts should select the most appropriate or analogous state statute of limitations." *Goodman v. Lukens Steel Co., 482 U.S. 656, 660, 96 L. Ed. 2d 572, 107 S. Ct. 2617 (1987)* (citing *Wilson v. Garcia, 471 U.S. 261, 266-68, 85 L. Ed. 2d 254, 105 S. Ct. 1938 (1985))*. In *Goodman*, the Supreme Court agreed with the respondents that Wilson's holding **HN4**[⬆] with respect to *§ 1983* claims -- that such claims are "in essence claims for personal injury [so] the state statute applicable to such claims should be borrowed" -- applied with equal force to claims arising under *§ 1981*. Thus, under *Goodman*, claims arising under *§ 1981* are governed by the residual limitations period that applies to personal injury suits filed in the forum state if the law of the relevant state does not provide a statute of limitations specific to **[\*17]** the claims presented. *See Goodman v. Lukens Steel Co., 482 U.S. 656, 660, 96 L. Ed. 2d 572, 107 S. Ct. 2617 (1987)*. Although Evans alleges that the defendants violated *§ 1981* and Ohio law by discriminating against him because of his race beginning in 1995, the district court properly concluded that only discriminatory conduct that occurred after June 4, 1996, two years prior to the date Evans filed his complaint, were actionable under Ohio statute of limitations. *See O.R.C. § 4112.99*.

Evans claims that *§ 4112.99*, which was amended in 1996 (the amendments contained in Ohio House Bill 350 became effective on January 27, 1997) to reduce the limitations period on discrimination claims from six to two years, does not apply to his claims regarding TRU's illegal conduct prior to 1996 because the statute may not be applied retroactively. Although Evans is correct that § 4112 must be applied prospectively, **HN5**[⬆] the Ohio courts have held that retroactivity is determined with respect to the time at which the action was filed, not with respect to the time at which the underlying offenses occurred. *See Schoenrade v. Tracy, 74 Ohio St. 3d 200, 658 N.E.2d 247 (1996)* **[\*18]** (holding that a limitations period that became effective after the plaintiff's cause of action accrued barred the plaintiff's claims because they were filed after the statute became effective); *see also State ex rel. Holdridge v. Industrial Comm'n, 11 Ohio St.*

*2d 175, 179, 228 N.E.2d 621 (1967)* (holding that "laws of a remedial nature providing rules of practice, courses of procedure, or methods of review are applicable to any proceedings conducted after the adoption of such laws"); *Denicola v. Providence Hosp., 57 Ohio St. 2d 115, 117, 387 N.E.2d 231 (1979)* (upholding the application of a recently enacted statute to a cause of action that accrued prior to the statute's adoption but that was not challenged in court until after the statute was enacted).

**HN6**[⬆] Under Ohio law, statutes of limitations are remedial and procedural in nature. *See Baird v. .Loeffler, 69 Ohio St. 2d 533, 535, 433 N.E.2d 194 (1982)*. The Ohio statute of limitations at issue in this case was amended in 1996 and, although Evans's claims reference discrimination that allegedly occurred in 1995, Evans did not file his complaint until June 1998. As a result, the district court correctly **[\*19]** concluded that his claims regarding the 1995 discrimination were barred by the statute of limitations. *See Buckeye Candy & Tobacco Co., Inc. v. Limbach, 28 Ohio St. 3d 40, 501 N.E.2d 1202, 1203 (1986)* (stating that a "procedural law is generally considered to be applied prospectively when it is applied to proceedings in which the particular *procedural aspect* regulated by the law [did not occur prior to the law's adoption]" (emphasis added)); *cf. also Forest v. United States Postal Serv., 97 F.3d 137 (6th Cir. 1996)* (holding that the 1991 amendments to Title VII's statute of limitations applied to any claims filed after the effective date of the amendments even if the underlying cause of action accrued prior to the amendment date).

Applicability of the "Continuing Violation" Exception to the Two-Year Limitations Period

As this court observed in *Gandy v. Sullivan County, 24 F.3d 861(6th Cir. 1994)*:

> **HN7**[⬆] The doctrine of continuing violations is a judicially-created one which has been used in two ways: It may provide the court with "jurisdiction" over a cause of action which was filed after the limitations period had run **[\*20]** on a discrete discriminatory act triggering the statute. The doctrine also may allow a court to impose liability on an employer for acts committed outside the limitations period [if the employee is able to prove

the continuing nature of the challenged activity].

*Id. at 864*. In *EEOC v. Penton Indus. Pub. Co., 851 F.2d 835, 838 (6th Cir. 1988)*, our court stated that, **HN8**[↑] to invoke the continuing violation exception to the limitations period, the moving party must show more than a single isolated incident of harm or otherwise demonstrate some "overarching policy of discrimination" that might constitute a "continuing violation." *Id. at 838* (internal citation omitted). Specifically, the moving party must show either a "long-standing and demonstrable policy of discrimination, such as an established and repeated pattern of paying men more than women," or "some evidence of present discriminatory activity giving rise to a claim of a continuing violation, i.e. where an employer continues to presently impose disparate work assignment or pay rates between similarly situated employee groups." *Ibid.; see also Calloway v. Partners Nat. Health Plans, 986 F.2d 446, 448 (11th Cir. 1993)* **[*21]** ("In determining whether a discriminatory employment practice constitutes a continuing violation, [the court must] distinguish[] between 'the present consequence of a one time violation, which does not extend the limitations period, and the continuation of the violation into the present, which does").

Despite the lack of evidence that Walsh gave Evans an unfavorable evaluation because of his race, TRU responded to Evans's complaints about Walsh by preventing Walsh from conducting any more of Evans's performance reviews. And despite subsequent favorable evaluations and the lack of any evidence of a racially hostile work environment, Evans maintains that TRU's failure to promote him is racially motivated and a continuing violation of his civil rights rather than a management decision based on a variety of non-race related factors. Evans states that he was entitled to a promotion solely on the basis of his performance reviews and management evaluations and, because he was not promoted, assumes that he was discriminated against because of his race. He then contends that, because the company has not promoted him since 1995, the discrimination is a continuing violation that should toll **[*22]** the statute of limitations. His logic is flawed.

To begin with, Evans has failed to identify a single incident in which a TRU employee directly or indirectly discriminated against him because of his race. Although he contends that the hostile treatment he received from Walsh in 1995 resulted in his being denied promotion in October 1996, there is no evidence that there was a vacancy for an Assistant Director at that time, or that

Evans expressed interest in, and was denied, the position on the basis of race. Indeed, Evans offers no evidence that even Walsh's evaluation was motivated by racial animus rather than by his job performance or by some other personal dislike.

In his brief before this court, Evans attempts to refute the district court's conclusion that the continuing violation doctrine does not apply to his claims by citing *Roberts v. North American Rockwell Corp., 650 F.2d 823 (6th Cir. 1981)*, in which this court observed with respect to application of the continuing violation doctrine that:

> This issue becomes more difficult when a company fails to hire or promote someone because of their race or sex. In many such situations, the refusal to hire or **[*23]** promote results from an ongoing discriminatory policy which seeks to keep blacks or women in low level positions or out of the company altogether. In such cases, courts do not hesitate to apply what has been termed the continuing violation doctrine.

It is true that failure to promote cases are more difficult to evaluate in this context than, for example, unequal pay cases, *see Gandy*, in which the employer repeats the violation by issuing a check every few weeks. However, the fact remains that Evans cannot benefit from the continuing violation doctrine in this case even under *Roberts* because he simply cannot establish the existence of an "ongoing discriminatory policy which seeks to keep blacks . . . in low level positions." As evidence of TRU's discriminatory policy against African-American employees, Evans states that, since January 1, 1994, only 3 of the 58 people who Toys R Us promoted from Manager to either Assistant Director or Store Director were black, and that he was never asked to supervise an African-American management trainee. In addition, Evans asserts that there is evidence that white managers with evaluations similar to his, including some who were rated **[*24]** as not yet promotable, were promoted shortly after these reviews.

Evans fails to mention how many African-American employees were eligible for promotion (if only 3, for example, then the company promoted 100% of those eligible), or that the six white employees who he asserts were promoted despite reviews similar to his did not work in his geographical region and were reviewed by different personnel in stores that may have had different management needs. In short, the bare assertion that TRU promoted only 3 African-American employees to

higher-level management positions and promoted white employees with less than outstanding evaluations does not, without more, establish an "ongoing discriminatory policy."

Because Evans fails to present evidence of a triggering event (i.e. that he was considered for, and denied, a promotion on the basis of his race) or other evidence of an "overarching policy of discrimination," *Penton, 851 F.2d at 838*, the district court correctly determining that the continuing violation exception to the statutory limitations period does not apply to his claims alleging discrimination that occurred prior to June 1996.

Evans's Failure to Establish  **[\*25]**   a Prima Facie Case of Race Discrimination

It is well-settled in this circuit that *HN9*[⬆] claims arising under both *§ 1981* and Title VII carry the same standards of proof. *See Harvis v. Roadway Express, Inc., 923 F.2d 59, 61 (6th Cir. 1991)*. Because Evans offers no direct evidence of race discrimination, [5] he can only prevail if he is able to establish a prima facie case of discrimination and then rebut TRU's justification for the challenged conduct by demonstrating that the proffered justification is merely a pretext for illegal discrimination. *See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*; *Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 253* & n.6, *67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*. *HN10*[⬆] The federal courts utilize the *McDonnell Douglas* burden-shifting framework to analyze claims of race discrimination arising under Title VII and *Section 1981* as well as under state anti-discrimination laws. *See, e.g., Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992)*.

 **[\*26]** *HN12*[⬆]

To establish a prima facie case of race discrimination in a failure to promote case, the plaintiff must present

---

[5] *HN11*[⬆] Direct evidence is evidence that, "if believed, proves the existence of discrimination 'without inference or presumption.'" *Lane v. Ogden Entertainment, Inc., 13 F. Supp. 2d 1261, 1274 (N.D. Ala. 1998)* (quoting *Carter v. Three Springs Residential Treatment, 132 F.3d 635, 641 (11th Cir. 1998))*. As the court went on to explain, "such evidence must truly be focused on the employment action at issue. Not only must it be evidence of discriminatory actions or statements of an employer, but the actions or statements at issue must correlate to the discrimination or retaliation complained of by the employee." *Ibid.*

evidence sufficient to convince a reasonable jury that: (1) he was qualified for the promotion at issue; (2) he is a member of a protected class; (3) he was "considered for and denied the position" in question; and (4) he was "rejected in favor of another person with similar qualifications who was not a member of [the] protected class." *Betkerur v. Aultman Hosp. Ass'n, 78 F.3d 1079, 1095 (6th Cir. 1996)*; *see also Allen v. Michigan Dep't of Corrections, 165 F.3d 405, 410 (1999)*. *HN13*[⬆] Once the plaintiff establishes a prima facie case, the defendant may rebut the presumption of illegal discrimination by articulating a legitimate, non-discriminatory reason for the challenged conduct. *See Burdine, 450 U.S. at 253*; *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)*. If the defendant is able to justify its conduct, the burden shifts back to the plaintiff to prove that the proffered explanation is pretextual. *See Burdine, 450 U.S. at 253*. In evaluating whether **[\*27]** the plaintiff has met his burden, it is "not enough . . . to 'dis' believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *St. Mary's, 509 U.S. at 506*.

In this case, the parties agree that Evans is a member of a protected class. However, even assuming that, because TRU does not post information about promotional opportunities and job vacancies, Evans need not identify a specific promotion for which he was considered and denied, he cannot establish a prima facie case of race discrimination because he fails to present evidence that he was treated less favorably than similarly situated, non-minority employees because of his race. *See, e.g., Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)* (stating that the plaintiff must be similarly situated to non-minority employees in the "relevant aspects of his employment").

Evans's claims at first appear to center on the allegation that Assistant Director Walsh gave him poor performance reviews because she had a "disdain for minorities and men" and that, because of her poor reviews (which the company knew to be racially motivated), **[\*28]** he was not promoted. However, as TRU points out and Evans concedes, he was evaluated by several supervisors besides Walsh, none of whom recommended him for promotion to Assistant Store Director. Perhaps in view of this. Evans argues on appeal that, in addition to the discriminatory treatment he received from Walsh, the defendants embraced a policy and practice of race discrimination that precluded his promotion.

Evans fails to establish a prima facie case of race discrimination primarily because he cannot show that he was "considered and rejected for" a higher position based on the company's decision to give that position to a non-African American employee who was in "all respects" similarly situated. *Mitchell, 964 F.2d at 582* (emphasis added).

In *Mitchell*, this court explained **HN14**[↑] the "similarly situated" element of the prima facie case as follows:

> It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly situated in all respects. Thus, to be deemed similarly situated, the individuals with whom the plaintiff seeks to compare his/her **[\*29]** treatment must have dealt with the same supervisor, have been subject to the same standards and have been engaged in the same conduct . . . .

*964 F.2d at 582-83* (emphases added). Although *Mitchell* states that the plaintiff must show that the "'comparables' are similarly situated in all respects," *ibid.* (emphasis added), our subsequent decision in *Ercegovich, 154 F.3d at 352*, clarifies that a plaintiff need not prove similarity in every respect. As stated in *Ercegovich*, however, **HN15**[↑] the plaintiff is "required to prove that all of the *relevant aspects* of his employment situation were 'nearly identical' to those of [the non-minorities'] employment situation[s]." *Ercegovich, 154 F.3d at 352* (quoting *Pierce v. Commonwealth Life. Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994)* (emphasis added).

Even if one construes Evans's strong performance reviews to mean that he was qualified for promotion, his qualifications alone do not show that other, non-African American employees were promoted above him because of race. Indeed, absent proof that these employees were similarly situated, we cannot **[\*30]** assume that the company that promoted Evans throughout his career and so often commended his performance embraced a policy of race discrimination and refused to further promote him because he was black.

In his attempt to establish a prima facie case by showing that TRU promoted other employees who were at most as qualified as he was but who did not belong to a protected class, Evans proffers the performance evaluations of six white employees who were promoted to Assistant Store Director or Director sometime in the past five years. *See Brown v. Tennessee, 693 F.2d 600, 603 (6th Cir. 1982)* (citing *McDonnell Douglas, 411 U.S. at 802*). Although these employees appear to have served in positions similar to that occupied by Evans, these employees did not work in Evans's geographic region, were not subject to the same standards of performance as Evans (the duties of different types of managers -- i.e. Storeroom vs. Front-End -- differ somewhat), and were not reviewed by the same supervisors, factors required to establish a prima facie case of race discrimination under *Mitchell* and *Ercegovich*.

Among other things, Evans's unwillingness to relocate **[\*31]** or to travel suggests that he cannot legitimately be compared with these employees, who received their promotions in other stores and regions. [6] The case law in this circuit is clear: **HN16**[↑] if a plaintiff cannot show that he was passed over for promotion in favor of a non-minority employee who was *similarly situated* in all relevant respects, he cannot meet his burden of proof under *McDonnell Douglas*. The record in this case supports the district court's conclusion that there is no evidence that the employees Evans identifies in his briefs: "(1) had experience and skills comparable to [his]; (2) were indeed promoted to higher positions; (3) were promoted over [him]; or (4) if promoted, were, like Evans, unwilling to relocate to a different store." JA 810. Given this, the performance evaluations of these other employees do not give rise to an inference of race discrimination.

**[\*32]** Evans's "evidence" that Walsh had "disdain" for minorities is similarly unavailing because it consists only in inadmissible hearsay statements attributed to other TRU employees who did not file affidavits or supporting depositions. The only evidence that Walsh made disdainful statements about minorities and men is Evans's own testimony that other employees told him they heard Walsh say such things. Certainly the email from HR Director Klugh stating that Walsh's review could put the company in a "sticky situation" does not alone support Evans's claims of a policy or practice of discrimination at TRU, especially given Klugh's remark

---

[6] Evans indicated his unwillingness to relocate or travel both in his deposition and in a survey he completed for TRU. In the survey, employees were asked if they would be willing to relocate "for promotion only," "for lateral or promotion," or whether they would "not [be] willing to relocate." Evans answered that he was "not willing to relocate" either "in the US or internationally." JA 216-17. In Section 6 of the survey, Evans also indicated "0% willingness to travel."

that Walsh "treats everyone poorly, not just minorities and men." In addition to finding that Evans's claims concerning Walsh's racial motivations lacked substantiation, the district court properly ruled inadmissible statements allegedly made by a former TRU employee (John Dover) that jokes and disparaging comments were made about minorities (not specifically Evans) in store director meetings because Dover did not testify to what he allegedly heard, nor did he submit an affidavit, so the only evidence that such comments were made came from Evans's testimony **[*33]** that, after Dover left TRU, Dover told him that some TRU employees made jokes and comments about black employees in store director meetings. *See Fed. R. Evid. 801(d)*.

As noted in the section addressing Evans's continuing violation claims, the "statistical" evidence that only 3 of the 58 employees promoted to Assistant Director were black, and that certain white employees were promoted despite receiving only average performance reviews, does not evidence a policy or practice of race discrimination. At all times relevant to this appeal, there were approximately 34 stores in Evans's region which together employed 102 store managers (3 per store), all of whom were potentially eligible for promotion to one of only 24 Assistant Store Director positions, only some of which will be vacant during any particular period of time. Evans's unwillingness to relocate to another region placed him in a highly competitive environment, and although he refers in his brief to six white employees who were promoted outside his region, he fails to identify even one similarly situated, non-minority employee in his region who was promoted above him.

In addition, although Evans has been evaluated **[*34]** by many different supervisors, his <u>overall</u> performance has always been determined to meet, not exceed, company expectations. Moreover, due to various medical conditions Evans has missed substantial time at work even during the Christmas season, which, according to TRU, is a "time crucial to the assessment of a manager's ability to take on the added responsibility of the Assistant Store Director position." Appellee's Br. at 8. Indeed, Evans acknowledged some of these deficiencies in his self-evaluations. These facts, combined with Evans's inability to produce evidence of racial discrimination by any TRU employee, even Walsh, support the district court's grant of summary judgment for the defendants. [7]

_____

[7] Even if Evans could establish a prima facie case of

**[*35]** <u>Evans's Claims That the Defendants Violated Ohio Public Policy</u>

The district court correctly concluded that Evans could not prevail on his public policy claims under Ohio law because Ohio courts do not recognize policy claims for failure to promote. Evans cites an Ohio court of appeals's unpublished opinion in *Powers v. Springfield City Sch., 1998 Ohio App. LEXIS 2827*. No. 98-CA-10 (June 26, 1998), to refute the district court's conclusion that there is no Ohio precedent authorizing the federal courts to extend the public policy tort to a failure to promote claim. In reaching its conclusion that only claims of wrongful discharge or discipline are actionable in tort as violations of Ohio public policy, the district court relied upon two leading cases in which the Ohio Supreme Court outlined the contours of the "public policy exception to the employment-at-will doctrine." JA 817 (citing *Kulch v. Structural Fibers, Inc., 78 Ohio St. 3d 134, 677 N.E.2d 308 (1997)*, *cert. denied 522 U.S. 1008, 118 S. Ct. 586, 139 L. Ed. 2d 423 (1997)*; *Greeley v. Miami Valley Maint. Contractors, Inc., 49 Ohio St. 3d 228, 233-34, 551 N.E.2d 981 (1990))*. **[*36]**

The *Powers* case that Evans cites on appeal does not

_____

discrimination, there is no evidence that he could successfully rebut as pretext the defendants' explanation for their decision not to promote him. If a plaintiff succeeds in establishing a prima facie case of discrimination, the "burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Burdine, 450 U.S. at 253*. If the defendant meets its burden, which involves no credibility assessment, the presumption raised by the prima facie case is rebutted, and the plaintiff must show that the proffered explanation is a pretext for discrimination by showing that the "reason [given] was false, and that discrimination was a real reason." *St. Mary's, 509 U.S. at 512 n.4*.

In considering the plaintiff's burden on this element, it is important to note that an employer may make employment decisions "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984)*; *see also Manzer v. Diamond Shamrock Chem. Co., 29 F.3d 1078, 1083 (6th Cir. 1994)* (similar). In this case, although Evans may be correct that TRU did not have a good reason for failing to promote him to Assistant Director, he has not alleged evidence sufficient to convince a reasonable jury that the defendants did not promote him because of his race. *See Manzer, 29 F.3d at 1083* (emphasizing that a factfinder may not reject an employer's proffered explanation "unless there is sufficient basis in the evidence for doing so").

show that the district court erred in its assessment of Ohio law because a more recent appellate court decision disagrees with *Powers. See Doneworth v. Blue Chip 2000 Commercial Cleaning, Inc., 1998 Ohio App. LEXIS 3171*, No. C-970379 (July 10, 1998) (holding that an employer's allegedly retaliatory determination to reduce the plaintiff's hours and support staff did not constitute 'discipline' under *Greeley* and therefore did not constitute an actionable claim for violation of public policy). Based on the Ohio appellate court's holding in *Doneworth* and the lack of reported precedent allowing plaintiffs alleging failure to promote to recover for violations of Ohio public policy, we conclude that the district court properly refused to recognize Evans's claims as actionable under Ohio law.

Even if Evans's public policy claims were cognizable under Ohio law, he could not prevail on these claims because he failed to produce evidence sufficient to establish a prima facie case of discrimination. *See Godfredson v. Hess & Clark, 996 F. Supp. 730, 739 (N.D. Ohio 1998)*, aff'd *173 F.3d 365 (6th Cir. 1999)* **[*37]** (citing *Kulch, 78 Ohio St. 3d at 162*).

### III

Because Evans has failed to produce evidence sufficient to establish a prima facie case of race discrimination, we AFFIRM the district court's order granting summary judgment for the defendants.

**Concur by:** R. GUY COLE, JR.

## Concur

**R. GUY COLE, JR., Circuit Judge, Concurring in Result.** Although I agree that Evans failed to establish a case of racial discrimination, I disagree with the majority's application of the similarly situated analysis in determining whether Evans established a prima facie case. The majority acknowledges that Toys R Us does not post information about promotional opportunities and job vacancies and that Evans cannot identify specific promotional opportunities for which he was denied. In determining that Evans was not similarly situated to the employees with whom he compared himself, however, the majority required Evans to show that he was similarly situated in aspects of his employment that were not relevant in the context of Toys R Us's promotion process. *See Ercegovich v.*

*Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)*. To determine whether Evans was similarly situated, **[*38]** I would analyze those aspects of Evans's employment that were relevant within the context of the employment-promotion process, and not substitute rigid requirements based on identical job functions or supervisors. Accordingly, I respectfully **CONCUR** in the result reached by the majority.

---

**End of Document**

 Last updated  April 14, 2026   03:11:29 pm GMT

# *Ball v. Holland*

United States Court of Appeals for the Sixth Circuit

June 28, 2005, Filed

File Name: 05a0555n.06

No. 04-5025

## Reporter

142 Fed. Appx. 860 *; 2005 U.S. App. LEXIS 12973 **; 2005 FED App. 0555N (6th Cir.)

CHARLES BALL, Plaintiff-Appellee; v. MICHAEL H. HOLLAND, et al. as Trustees of the UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN AND TRUST; Defendants-Appellants.

**Notice: [**1]** CONSULT 6TH CIR. R. 32.1 FOR CITATION OF UNPUBLISHED OPINIONS AND DECISIONS.

**Prior History:** On Appeal from the United States District Court for the Eastern District of Kentucky.

## Core Terms

disability, pain, back pain, mining, benefits, district court, substantial evidence, depression, causation, total disability, pension plan, causation requirement, explosion, disorder, injuries, carpal tunnel syndrome, depression and anxiety, diagnosed, pension, back injury, de minimis, contributed, shoulder, anxiety, chronic

## Case Summary

### Procedural Posture

Plaintiff mine worker sought review of the denial of Employee Retirement Income Security Act pension plan disability benefits.  Defendant trustees had found the disability, affective (mood) and anxiety disorders, was not the result of a mine accident. On cross-motions for summary judgment, the United States District Court for the Eastern District of Kentucky granted the worker's motion and denied the trustees' motion. The trustees appealed.

### Overview

The plan stated the disability had to result from an accident.  The district court's conclusion that the trustees' denial of benefits was not supported by substantial evidence was premised on the erroneous application of a de minimis causation requirement. There was substantial evidence, in the Social Security Administration's determination of the disability onset date, that the worker's depression and anxiety did not rise to the level of total disability until three years after his last mining accident. There was substantial evidence the depression and anxiety were caused by several factors, that severe pain was but one factor. Several of those factors, such as an ear problem and carpal tunnel syndrome, were not from a mining accident. Thus, the conclusions of two doctors, that the depression was caused by pain resulting from the last accident, did not compel a contrary conclusion. The denial of benefits was not an unjustified mistrust of the conclusions of those doctors that the worker suffered from depression caused in part by severe pain; only a mistrust of their conclusion that the cause of that pain was his last accident. The trustee's denial of benefits was reinstated.

### Outcome

The district court's decision was reversed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Summary Judgment > Appellate Review > General Overview

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > Appeals > Standards of Review > General Overview

**HN1**[⬇] **Standards of Review, De Novo Review**

The appellate court reviews a district court's grant of summary judgment de novo. In reviewing the district court's judgment, the appellate court must determine whether the district court applied the proper standard of review in assessing the merits of the summary judgment motion.

Pensions & Benefits Law > ... > ERISA Pension Plan Qualification Requirements > Participation & Vesting > Vesting Requirements
Business & Corporate Compliance > ... > ERISA Pension Plan Qualification Requirements > Participation & Vesting > Vesting Requirements

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Pensions & Benefits Law > ERISA > Civil Litigation > General Overview

Pensions & Benefits Law > ERISA > Civil Litigation

**HN2**[⬇] **Participation & Vesting, Vesting Requirements**

In Employee Retirement Income Security Act cases, the decisions of a plan administrator are subject to review under the "arbitrary and capricious" standard if the plan vests discretionary authority in the administrator. Where the plan vests discretionary authority in the trustees and the arbitrary and capricious standard applies, the abuse of discretion standard requires that the trustees' decision be upheld if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.

**Counsel:** For CHARLES BALL, Plaintiff - Appellee: P. Heith Reynolds, Wolfe, Williams & Rutherford, Norton, VA.

For MICHAEL H. HOLLAND, JOSEPH P. BRENNAN, MARTY D. HUDSON, B. V. HYLER, as Trustees of the

UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN, Defendants - Appellants: Thelma Y. Hawkins, United Mine Workers of America, Health & Retirement Funds, Washington, DC.

**Judges:** Before: BOGGS, Chief Judge; CLAY, Circuit Judge; WALTER, District Judge [*] .

**Opinion by:** WALTER

# Opinion

 **[\*861] WALTER, District Judge.** Defendants-Appellants, the Trustees of the United Mine Workers of America 1974 Pension Plan and Trust ("Trustees"), appeal from the district court's **[\*\*2]** grant of summary judgment to Plaintiff-Appellee, Charles Ball ("Ball").

The Trustees denied Ball disability pension benefits after determining that his disability, affective (mood) and anxiety disorders, was not the result of a mine accident. Ball appealed the Trustees' decision by filing a complaint in the United States District Court for the Eastern District of Kentucky. Cross-motions for summary judgment were filed, with the district court granting Ball's motion and denying the Trustees' motion.

The Trustees contend that the district court improperly applied the "arbitrary and capricious" standard of review and that the Trustees' administrative decision to deny Ball's application for disability pension benefits was supported by substantial evidence. This court agrees with the Trustees. As such, the district court's decision is hereby REVERSED and the decision of the Trustees is reinstated.

**I.**

Ball worked as a coal miner for Arch of Kentucky from 1975 until January 1997. During that time Ball was injured in three mining accidents. In May 1993, Ball strained his back and right shoulder while lifting blocks at work. He did not receive medical attention specifically for that **[\*\*3]** injury, but a doctor treating him for an unrelated condition in June 1993 noted that his shoulder was improving and was expected to heal fully within a few weeks. In March 1994, Ball injured his left shoulder

---

[*] The Honorable Donald E. Walter, United States District Judge for the Western District of Louisiana, sitting by designation.

in a mine accident, but did not seek medical attention and lost no time at work. Finally, in June 1996, Ball sustained neck and back injuries as a result of an explosion in the mine. He was treated in a hospital emergency room two days later for back pain apparently caused by a bruise on his lower back, and released the same day. In 1997 Ball resigned from Arch at the suggestion of his doctor. He then worked briefly as a truck driver, but soon found himself unable to work due to numerous emotional and physical problems.

In addition to the injuries Ball sustained in the mine accidents, he experienced many other medical problems. In September 1992, Ball was admitted to a hospital for treatment for persistent otorrhea (discharge from the ear) caused primarily by herpes zoster of the ear, which caused him extreme pain. Ball was treated for severe ear pain in 1993, 1995, 1996, and 1999, and was prescribed narcotic pain killers, to which he became addicted. The pain and bleeding caused **[\*\*4]** by the herpes zoster prevented Ball from working on several occasions. In March 1997, Ball's primary care physician, Dr. F. Andrew Morfesis opined that Ball was unable to go back to work in the coal mines due to problems with herpes zoster.

In July 1994, Ball was diagnosed with bilateral carpal tunnel syndrome, for which he received workers' compensation. However, Ball never claimed the bilateral carpal tunnel syndrome was a result of a mine accident. Ball's primary physician, Dr. Morfesis, and an orthopedic surgeon, Dr. David E. Muffly, have subsequently opined that Ball's disabilities are the result of this carpal tunnel syndrome.

 **[\*862]** Beginning in 1992, Ball's physicians also reported that he had emotional problems. Ball was advised to seek psychiatric help on several occasions. The physicians opined that Ball suffered from depression, insomnia and anxiety due to stress, financial problems and family issues.

Ball has also been treated several times for back pain and arthritis. In November 1994, Ball complained of lower back pain allegedly caused by carrying an oxygen tank and compressor in the mine, but a neurological examination showed no damage. In July 1996, Dr. Morfesis noted **[\*\*5]** that Ball suffered from arthritis related to repetitive work trauma, and diagnosed back pain syndrome without any specific cause. During 1999 and 2000, Ball was treated for back pain by at least nine different physicians. At some of these visits, Ball told the physicians that his back pain began after a 1996 mining

accident. However, at other visits, Ball stated that he had no previous back injuries, that his back had just begun to hurt one morning, he had no hip or back pain in the past, and that his back pain was "unprovoked".

## II.

*HN1*[⬆] This court reviews a district court's grant of summary judgment *de novo. See Roush v. Weastec, Inc., 96 F.3d 840, 843 (6th Cir. 1996)*. In reviewing the district court's judgment, we must determine whether the district court applied the proper standard of review in assessing the merits of the summary judgment motion. *HN2*[⬆] In ERISA cases, the decisions of a plan administrator are subject to review under the "arbitrary and capricious" standard if the plan vests discretionary authority in the administrator. *Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989)*; *Wendy's Int'l v. Karsko, 94 F.3d 1010, 1012 (6th Cir. 1996).* **[\*\*6]** In this case, the parties and the district court agree that the Plan vests discretionary authority in the Trustees, and that the arbitrary and capricious standard applies. Therefore, the abuse of discretion standard requires "that the Trustees' decision be upheld if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of Am. Health & Ret. Funds, 929 F.2d 1140, 1144 (6th Cir. 1991)*.

## III.

Article II.C. of the Plan provides that:

> A Participant who. . . becomes totally disabled *as a result of* a mine accident. . . shall, upon retirement, be eligible for a pension while so disabled. A participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits.

(emphasis added). In order to be entitled to benefits, Ball is only required to show that his mine accidents were "substantially responsible" for his disabilities, not that the accidents were the sole cause of his disabilities. *See Robertson v. Connors, 848 F.2d 472, 476 (4th Cir. 1988)*; **[\*\*7]** *see also Boyd v. Trustees of United Mine Workers Health & Ret. Funds, 873 F.2d 57, 59 (4th Cir. 1989)* (addressing the pension plan at issue in this case, and stating that disability "as a result of a mine accident" requires that the mine injury be "substantially

responsible for plaintiff's inability to perform his job").

The district court misinterpreted the causation requirement of the Plan. The court ruled that the Trustees' decision must be based on whether the mine accidents contributed "in some part" to Ball's disabilities, and not whether they were substantially responsible for the disabilities (citing *Odom v. Mine Workers of Am. Health & Ret. Funds, 687 F.2d 843, 847 (6th Cir. 1982))*. The district court found that substantial evidence existed that **[*863]** Ball's depression and anxiety were at least partially caused by pain resulting from the accidents, and therefore reversed the Trustees' decision. This interpretation of the Plan's causation requirement is not warranted by either the text of the Plan itself, which simply states that the disability must result from an accident, or by the cases cited by the district court in support of its reading.

**[**8]** The district court relied on two cases holding that causation may be established by showing that a mine accident was a cause of a claimant's disability, even if it was an insignificant cause, or merely exacerbated a preexisting disability unrelated to the accident. *See Boyd v. Trustees of the United Mine Workers Health & Ret. Funds, 873 F.2d 57, 60 (4th Cir. 1989)* (proximate causation established when injury exacerbated a preexisting condition or combined with pre- or post-accident conditions); *Odom, 687 F.2d at 848* ("the record as a whole permits but one conclusion: that at least a portion of appellant's disability was caused by his fall while working at his job in the mines."). Neither case justifies the district court's *de minimis* requirement that Ball's mining accidents need only have contributed in some part to his disability. Far from employing a *de minimis* causation requirement, *Boyd* made clear that -- as we noted above -- a worker will only be eligible for benefits "if the plaintiff was injured in a mine accident and that injury, whether in combination with a previous or subsequent condition, is *substantially responsible* for **[**9]** plaintiff's inability to perform his job…" *873 F.2d at 59* (emphasis added) (quoting *Robertson, 848 F.2d at 476*). *Odom* did employ a *de minimis* causation requirement, but did so only after noting that the "proximate cause principle" set forth in the Union's "Health Services Card Processing for Disabled Mine Workers" stated that:

> If the mine accident aggravated a pre-existing condition to the extent that the person became totally disabled, or if the mine accident occurred after a non-mine related injury and the two injuries combined resulted in total disability, then the mine

worker shall be deemed to be totally disabled as a result of a mine accident. This rule applies even if evidence establishes that the mine related condition is only a small percentage of the disability.

*Odom, 687 F.2d at 847*. There is no evidence in the record that this document is still in effect, and neither Ball nor the district court claim that the Trustees are still bound by this definition of proximate cause. Absent such evidence, the Trustees' decision must be upheld if substantial evidence exists that Ball's mine accidents were not a **[**10]** substantial cause of his disabilities.

The district court's conclusion that the Trustees' denial of benefits was not supported by substantial evidence is premised on the court's erroneous application of a *de minimis* causation requirement. The district court found that the opinions of Drs. Evans and Riggs and Ms. Taylor were sufficient to establish that Ball's 1996 accident was at least a cause of his disabilities. The Trustees could not reasonably reject those opinions, the court concluded, because the opinions of Evans and Taylor were relied on by the Social Security Administration in its disability determination, [1] and because the Trustees had no **[*864]** reason to doubt Dr. Riggs's competency. Given this evidence that the accident played a role in causing Ball's disabilities, the district court rejected as irrelevant the evidence the Trustees relied on that indicated other causes for his depression and anxiety because -- under the district court's interpretation of the Plan's causation requirement -- Ball was not required to show the accident was a substantial cause of his disabilities in order to be eligible for pension benefits.

**[**11]** Applying the correct "substantial causation" test, the Trustees' determination is supported by substantial evidence. There is substantial evidence, in the form of the SSA's determination of the onset date of Ball's disability, that his depression and anxiety did not rise to the level of total disability until late 1999, three years after Ball's last mining accident. There is substantial evidence that Ball's depression and anxiety were

---

[1] The district court ascribes undue significance to the fact that the Social Security Administration relied on the reports of Dr. Evans and Ms. Taylor in determining that Ball was disabled. The SSA's determination was limited to the fact of Ball's disability, not with its ultimate cause, and the SSA therefore could have accepted Evans's and Taylor's conclusions that Ball's depression was caused by severe pain without also accepting, or even considering, their further conclusions that his pain was caused by the 1996 accident.

caused by several factors, among which severe pain was but one factor. There is also substantial evidence that Ball's pain was caused by several factors, including herpes of the ear, degenerative back problems, which cannot be deemed due to a mining accident under the terms of the Plan, and carpal tunnel syndrome, which two doctors believe to have been the primary cause of his suffering, and which has never been claimed to be due to a mining accident. Finally there is substantial evidence that the injuries caused by Ball's mining accidents were not particularly serious in comparison with his other problems. Given this evidence that Ball's mining accidents constituted, at most, one of many causes of his pain, which was in turn but one of several causes [**12] of his disabilities, the conclusions of Drs. Evans and Riggs and Ms. Taylor that Ball's depression was caused by pain resulting from his 1996 accident do not compel a contrary conclusion. The opinions of Drs. Evans and Riggs and Ms. Taylor appear to have been based on Ball's self-reported medical history, in which he emphasized the injuries he suffered in 1996. The Trustees' denial of benefits does not entail an unjustified mistrust of the conclusions of these doctors that Ball suffered from depression caused in part by severe pain; only a mistrust of their conclusion that the cause of that pain was his 1996 accident. Therefore, the decision of the district court is REVERSED and the decision of the Trustees' is reinstated.

**Dissent by:** CLAY

# Dissent

**CLAY, Circuit Judge, dissenting.** The record in this case demonstrates that Charles Ball's disabilities were substantially caused by chronic pain, including pain resulting from a 1996 mining explosion in which he injured his back. Ball was therefore entitled to receive benefits under the United Mine Workers of America 1974 Pension Plan, and neither the plan administrator's decision denying him those benefits, nor the majority's endorsement of [**13] that decision today, is supported by substantial evidence.

Under the Pension Plan, a miner is entitled to disability benefits when he "becomes totally disabled as a result of a mine accident." The Pension Plan offers no further discussion of the causation standard to be employed. The majority purports to rely on *Robertson v. Connors, 848 F.2d 472 (4th Cir. 1989)* to define "as a result of," but actually employs a standard stricter than that

adopted in *Robertson.* By doing so, and by glossing over the medical evidence in this case, the majority arrives at the erroneous conclusion that Ball is not disabled "as a result of a mine accident."

In *Robertson,* the Fourth Circuit explained that under the Pension Plan, a miner's total disability results from a mine accident when he is "injured in a mine accident and that injury, *whether in combination with a previous or subsequent condition,* is substantially responsible for plaintiff's inability to perform his job and [*865] for whatever medical and vocational reasons he is unable to perform an alternative job." *Robertson, 848 F.2d at 475* (emphasis added). The majority claims to adhere to this standard. [**14] However, it essentially ignores the italicized language, with disastrous results for Ball, as it was the pain caused by a mining accident, in combination with pain caused by other medical problems, which substantially caused his disabling depression and anxiety.

Before explaining further how Ball is able to meet the requirements of the *Robertson* causation standard, it is worth noting the lengths to which the majority goes to prevent Ball from relying on a lesser standard of causation. The majority strongly urges that *Odom v. Mine Workers of Am. Health & Ret. Funds, 687 F.2d 843, 847 (6th Cir. 1982)*, which authorizes a "contributed in some part" standard of causation, is inapplicable here. According to the majority, *Odom* is irrelevant because it was based in part on *de minimis* language set forth in the UMWA's "Health Services Card Processing for Disabled Mine Workers," and "there is no evidence in the record that this document is still in effect."

The majority's argument in this respect was never made by Defendants. In fact, Defendants have repeatedly articulated a causation standard identical or similar to that announced in *Odom.* In moving for summary [**15] judgment, Defendants cited *Odom* for the proposition that Ball was required to show either that a mine accident was "substantially responsible for" his disability, or merely that it "contributed in some part to" his disability. Defendants' brief suggests that Ball need only establish a "causal link" between his mining accidents and his disability. Finally, the pension analyst who wrote the report denying Ball's application for pension benefits framed the causation question as whether Ball's disability was "related to a mine accident."

There can be no doubt that Ball would prevail if he were

simply required to show that his mine accident "contributed in some part" to his disability, or that his disability was "related to" a mine accident. This makes the majority's reliance on arguments never articulated by Defendants to bar Ball from prevailing via such a showing particularly troubling. Defendants do not challenge the district court's enunciation of the causation standard, and it is generally established that an appellate court will not entertain issues which are not raised in the appellant's brief. *FED. R. APP. P. 28(a)*; *Bickel v. Korean Air Lines Co., Ltd. 96 F.3d 151, 153 (6th Cir. 1996)*; **[\*\*16]** *Priddy v. Edelman, 883 F.2d 438, 446 (6th Cir. 1989)*.

The majority's consideration of an argument not raised in the briefs, which resulted in its rejection of the *Odom* standard, would less troubling had it correctly applied the *Robertson* standard. A correct reading of *Robertson* makes it clear that Ball was entitled to benefits under the Plan if the pain he experienced as a result of injuries sustained in mining accidents, in combination with both pre- and post-existing factors, is substantially responsible for his disabling mood disorders. Ball satisfied this standard, and the plan administrator's determination to the contrary is not supported by substantial evidence.

As the majority notes, the relevant disability for purposes of the Pension Plan is the disability determined by the Social Security Administration, which found that Ball was disabled by an anxiety disorder and depression. Though the majority gives it short shrift, there is much evidence, in the form of reports from various doctors and a social worker, that those disabilities were substantially caused by the great pain and suffering affecting Ball **[\*866]** as a result of the mining accidents and other **[\*\*17]** injuries.

It is true that Ball's pain and depression pre-dated the 1996 mine explosion in which he injured his back. However, it is also very clear that Ball's pain was greatly exacerbated by the back injury. He was treated for the back injury with Percocet. Ball's medical records indicate that tenderness in his lower back area and his limited range of motion remained over a month after the accident. Over the next few years, Ball's complaints of back pain increased. In 1999, Ball was treated by Dr. John W. Gilbert, who diagnosed him with various back ailments and noted that his back pain dated back to the 1996 accident. Dr. George Privett performed an MRI on Ball in July 1999, finding several back problems and observing that Ball's back pain was the result of the 1996 accident. In December of that year, Ball was seen by licensed social worker Deirdra Fisher Taylor, who observed signs of a major depressive disorder, and noted that "chronic pain and other issues" necessitated therapy. Taylor ascribed the pain to the 1996 explosion. On the same day, Ball saw Dr. Robert Evans, who diagnosed him with various back problems dating back to the 1996 accident.

In January 2000, Ball was examined **[\*\*18]** by Dr. Christa Muckenhausen. She noted that Ball had severe low back pain radiating into both legs, as well as neck pain radiating into both shoulders, and observed that sitting, standing, or walking for more than five to ten minutes increased his pain. Dr. Muckenhausen further observed that Ball was "extremely anxious and depressed due to the persistant [sic] pain and the fact that he cannot function as he did previously."

On February 14, 2000, psychiatrist Dr. Rosa Kathleen Riggs saw Ball and reviewed his medical records from six different doctors. Dr. Riggs diagnosed Ball with major depression, generalized anxiety disorder, chronic pain disorder with both psychological factors and a general medical condition consisting of various physical ailments, including back injury. She noted that these mental and physical health problems would make it impossible for Ball to "perform simple, repetitive tasks or relate to others or tolerate the stress and pressures associated with day to day work activities." In April 2001, in response to a letter from Ball's attorney, Dr. Riggs expressed her opinion that Ball is "totally and permanently disabled as a result of that mining accident in 1996." **[\*\*19]** Dr. Riggs explained that the mining accident was the cause of Ball's depression and pain.

Dr. Morfesis saw Ball again on March 13, 2000, for complaints of diffuse arthritis pain, fever blister, and back pain with weakness of the left leg; Dr. Morfesis noted that his left leg problem was due to spinal stensosis. Dr. Morfesis also reported that Ball's wife had left him recently, and that consequently Ball was quite depressed. In a letter dated August 28, 2001, Dr. Morfesis identified himself as Ball's primary treating physician from 1989 to 2000, and wrote: "Charles E. Ball is totally disabled from working as a direct result of the 1994 carpal tunnel injury. Mr. Charles E. Ball sustained this injury at work in the coal mines. In addition he was re-injured in 1996 during an explosion that injured his lower back."

On August 31, 2000, Dr. David E. Muffly saw Ball for an orthopedic evaluation. Ball complained of back pain dating to the June 1996 injury and continuing problems

with carpal tunnel syndrome. Dr. Muffly's assessment was that Ball had recurrent carpal tunnel syndrome with failed second surgery on the right hand and degenerative disc disease, and that he was disabled. Dr. Muffley **[\*\*20]** noted that Ball could lift nothing heavier than ten pounds, should avoid **[\*867]** repetitive use of his hands, and could not use hand controls.

Finally, Ball saw Dr. Robert S. Spangler, of Appalachian Psychological Consultants, on August 1, 2002. Dr. Spangler explained that Ball had experienced chronic low back pain as well as pain and both hips, his left leg, and his neck and shoulder since the 1996 mine accident. Dr. Spangler also noted that Ball "developed bouts of depression since the explosion in 1996 that continues to date. This depression has worsened since 1999 but still traces back to his traumatic injury in the 1996 explosion."

It is evident that at least seven doctors diagnosed Ball with back pain dating back to the 1996 mining incident. Three doctors and one social worker opined that Ball's anxiety and depression were attributable in substantial part to that pain. Moreover, not a single doctor has disputed Ball's contention that his mood disorders were substantially caused by his chronic pain, including his back pain. Some physicians have indicated that there were other stressors in Ball's life, but none have suggested that his pain was not a substantial factor. Ball is not required **[\*\*21]** to show that the 1996 accident was the sole cause of his disability. *See Robertson, 848 F.2d at 476*.

In other words, Ball established that pain caused by the 1996 mining accident, in combination with pain from other injuries, was substantially responsible for his depression and anxiety. This suffices under *Robertson* to satisfy the causation requirement of the 1974 Pension Plan. Furthermore, the plan administrator's determination that Ball was not entitled to benefits is simply not supported by substantial evidence, as required under our precedent; indeed, it is not supported by any evidence at all. *See Baker v. United Mine Workers of America Health & Retirement Funds, 929 F.2d 1140, 1144 (6th Cir. 1991)*. The district court correctly found that the denial of those benefits constituted an abuse of discretion. I therefore respectfully dissent.

**End of Document**